**Donald G. WATTS, Plaintiff,**

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. 3:95–CV–274–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

July 11, 1995.

Donna P. Savage, Charlotte, for plaintiff.

Kenneth S. Cannaday, Charlotte, for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Plaintiff's application for a Temporary Restraining Order and a Motion for a Preliminary Injunction prohibiting Defendant from denying full coverage and benefits under its policy, and reasonable attorney's fees filed June 23, 1995. A hearing was held by this Court on July 5, 1995, at which both parties presented their arguments as to the Preliminary Injunction.

### SUMMARY OF FACTS

The Plaintiff in this action is 26 years old and suffers from Primitive Neuroectodermal Tumor (PNET), a rare form of brain cancer that affects children and young adults. He has a medical insurance policy with Massachusetts Mutual Life Insurance Company (hereinafter M/M) which is a group policy through his employer. Watts' treating oncologist (Dr. Michael Livingston) has recommended a treatment of high dose chemotherapy and supportive autologous bone marrow transplant (ABMT). The cost of providing the proposed procedure is in excess of $130,000.

### AFFIDAVIT OF DR. HENRY S. FRIEDMAN

Dr. Henry S. Friedman (Professor of Pediatrics, Division of Hemotology–Oncology at Duke University Medical Center) provided an affidavit, (Exhibit 3 to Plaintiff's Brief) which states in Paragraph 4, 8 and 9:

4. Donald Watts has a rare form of pediatric cancer known as a PNET which is biologically akin, if not identical to a neuroblastoma. It is my opinion that he should undergo ABMT treatment at the Center as [sic] because it provides the only meaningful chance of a curative intervention for Donald. If he is given this treatment, his long-term prognosis would be

significantly better than if he were given only conventional chemotherapy. Without, ABMT his chances for long-term (more than five years) survival are not good, in fact only ten percent (10%).

8. AMBT treatment is commonly and customarily recognized in the field of pediatric oncology and is now generally accepted as appropriate treatment of various types of cancer, including neuroblastomas and PNET. The process is neither strictly educational or experimental, nor is its primary purpose research. Rather, the primary purpose is to provide the patient with the best chance for a cure and long term control of the disease. The vast majority of children with cancer are on some type protocol. Unlike treatment for adult cancers there are no standard options of treatment besides enrollment in one of these protocol for pediatric cancers. In addition, PNET are so rare that it is likely that they will never be treated with anything beyond a Phase II clinical trial.[1]

9. The FDA has approved the protocol of cyclophosphamide and melphalan followed by autologous bone marrow transplant.

### THE PROTOCOL

The title of the Protocol as provided by Duke University Medical Center to the Defendant is: "Melphalan and Cyclophosphamide Followed by Autologous Bone Marrow Rescue for Patients with Brain Tumors, Phase II," dated September 30, 1994. It indicated there were seven "investigators" in addition to Dr. Friedman.

The introductory paragraph is as follows:

1.0 *Introduction*

We have completed a phase I *study* of high-dose chemotherapy with autologous bone marrow rescue for pediatric patients with supratentorial gliomas or recurrent brain tumors. In that *study,* patients with extremely poor prognoses, namely those with recurrent brain tu-

---

1. It is interesting to note that paragraph 4 of Dr. Friedman's affidavit and paragraph 4 of Dr. Livingston's affidavit are substantially identical in wording. The same is true for paragraph 7 of Dr. Friedman's affidavit and paragraph 5 of Dr. Livingston's affidavit. Paragraph 8 of Dr. Fried-

man's affidavit is identical with paragraph 6 of Dr. Livingston's affidavit, as is paragraph 10 of Dr. Friedman's affidavit and paragraph 7 of Dr. Livingston's affidavit. Dr. Friedman's affidavit is dated June 21, 1995 and Dr. Livingston's affidavit is dated June 22, 1995.

mors and untreated glial tumors, received melphalan, 75 mg/m$^2$ to 180 mg/m$^2$, and cyclophosphamide, 6.0 gm/m$^2$, followed by autologous bone marrow (and sometimes, stem cell) rescue. Patients were treated in cohorts of 3 or 4 in escalating doses. Previous *studies* had shown 180 mg/m$^2$ to be the maximum tolerated dose and 3 of 6 patients treated at this level in our phase I *study* developed anorexia that requiring [sic] parenteral hyperalimentation for more than 40 days post transplant. We now propose to conduct a phase II *study* using cyclophosphamide, 1.5 mg/m$^2$/day × 4 days, and melphalan, 60 mg/m$^2$/day × 3.

In the phase I *study*, we treated 3 patients at 75 mg/m$^2$, 99 mg/m$^2$, 4 at 120 mg/m$^2$, 3 at 150 mg/m$^2$, and 6 at 180 mg/m$^2$. All patients developed severe marrow aplasia, as expected. There were no significant cardiac or pulmonary toxicities. One patient with a spinal cord glial tumor developed increasing paraparesis of his lower extremities approximately 7 days after BMT; MR scans then and subsequently showed no evidence of progressive tumor. As noted above, 3 of 6 patients treated with 180 mg/m$^2$ of melphalan developed persistent anorexia.

There followed a table entitled "Tumor response is noted as follows". This was followed by a paragraph which stated:

While 12 of 20 patients continue to show progression-free survival, only three of the 12 have remission durations greater than one year, *making the follow up too short to provide definitive conclusions.* All the patients with recurrent disease following bone marrow transplant, except for patient # 17, have died of their disease.

Paragraphs 7.0, 7.1, 7.2, 7.3, 7.4, and 7.5 of the Protocol in pertinent part are as follows:

### 7.0 Statistical Considerations

### 7.1 Accrual Goal

Forty patients will be accrued to this *study*. The Phase I *study*, which is the basis for this *study*, accrued at the rate of approximately one patient per month. Hence, accrual should be completed within approximately 3.5 years.

### 7.2 Study Design and Primary Analysis

The primary purpose of this *study* is to determine the proportion of patients who remain alive without disease progression two years after undergoing treatment with melphalan and cyclophosphamide with bone marrow transplantation.

A Phase II design will be used to test the hypothesis $H_0$: $p \leq 0.05$ versus $H_1$: $p \leq 0.2$, where p is the proportion of patients who remain alive without disease progression two years after transplant. Forty (40) patients will be entered onto this *study*. If four or fewer patients are alive two years after transplant without progression, it will be concluded that the regimen is not worth further investigation ($p \leq 0.05$). Otherwise, the conclusion will be that the proportion of patients who remain alive without disease progression two years after treatment is 20% or greater.

. . . .

### 7.3 Monitoring for Acute Toxicity

A two-stage design will be used to monitor the acute toxicities associated with this treatment. If the proportion of patients experiencing acute toxicities is high, the *study* will be terminated early and it will be concluded that the treatment regimen is too toxic for further investigation. Specifically, the hypothesis which will be tested is: $H_0$: $p \leq 0.3$ versus $H_1$: $p \leq 0.1$, where p is the proportion of patients who experience acute toxicities.

Twenty patients will be enrolled onto the first stage of the *study*. If at any point during the accrual of these 20 patients, three or more patients experience acute toxicity, the *study* will be terminated early. Otherwise, an additional 20 patients will be accrued. If seven or more patients among the total 40 patients experience acute toxicity, the *study* will be terminated and it will be concluded that the treatment regimen is too toxic. Otherwise, it will be concluded that the

acute toxicity for this treatment regimen is acceptable. The probability of erroneously deciding that the treatment regimen is too toxic ($p \leq 0.30$) when it is actually safe ($p = 0.10$) is 0.058, i.e. a = 0.048. the [sic] probability of erroneously concluding that the treatment is safe ($p \leq 0.010$) when the true proportion of patients who experience acute toxicity is 30% is 0.076, i.e. ?? = 0.076. The probability of stopping the *study* early after the first stage of accrual when the true acute toxicity rate is 20% and 30% is 0.794 and 0.965, respectively.

7.4 Logistics of Conducting *Study*

Twenty patients will initially be accrued to this *study*. Once 20 patients have been accrued to the *study*, accrual will be suspended until it is clear that no more than two patients experience acute toxic events. Once it is determined that 0, 1, or 2 acute toxic events have occurred among the first 20 patients, an additional 20 patients will be accrued onto the *study*.

If at any time during the accrual of the first 20 patients onto this *study* it is determined that three or more patients have experience [sic] acute toxicity, accrual will be terminated immediately. Similarly, if at any time during the accrual of the second stage it is determined that seven or more patients have experience [sic] acute toxicity, accrual will be terminated immediately.

The primary efficacy endpoint of progression-free survival at two years will not be monitored after the first stage of accrual due to the extended amount of time (two years) needed to determine the endpoint of each patient.

7.5 Analytic Methods

Kaplan–Meier curves will be used to describe overall survival and failure-free survival (Kaplan and Meier, 1958). Survival time is defined as the time between initiation of treatment and death or last known follow-up. Failure-free survival is computed as the time between initial registration and disease progression, death, or last known follow-up.

The frequency of toxicity occurrence will be tabulated by the most severe occurrence.

## INFORMED CONSENT FORM

In addition to the protocol the Defendant requested and Duke Medical Center furnished a copy of the "Informed Consent" form (required by the Medical Center) which in pertinent part provides:

### Informed Consent

Research Study of Melphalan and Cyclophosphamide Followed by Autologous Bone Marrow Rescue for Patients with Recurrent Non-glial Brain Tumors, Phase II

IRB# 1258–94–9R1 [2]

11–28–94

I, _____, agree to allow my child to participate in this investigation which has been explained to me by Dr. _____. This investigational research *study* is being conducted by physicians at the Duke University Medical Center.

It has been explained to me that my child has a malignant brain tumor. In the past, tumors like my child's tumor have usually been treated with radiotherapy, which has prolonged life but rarely resulted in a cure for the disease. Recently, certain anticancer drugs have been identified which appear capable of shrinking the tumor, although, again, only very rarely resulting in a cure of the disease. The treatment in this *study* involves giving very high doses of two chemotherapy drugs active against brain tumors, cyclophosphamide and melphalan. Because these drugs can damage the bone marrow (the blood-making organ), it will be necessary to remove a portion of my child's bone marrow so that it can be returned after chemotherapy is completed. The purpose of this *study* is to see if using very high doses of the drugs cyclophosphamide and melphalan, followed by the return of the bone marrow as a "rescue" following the administration of the standard radiation or chemotherapy

2. It is presumed "IRB" refers to Institutional Review Board.

treatments result in an improved chance of survival and cure from the brain tumor.

. . . .

### Bone Marrow Harvest

The bone marrow harvest will be done sometime prior to the chemotherapy discussed below. My child's physicians will determine the best time for the marrow to be harvested. In this procedure my child will receive general anesthesia in the operating room and will have multiple punctures (needle sticks) of the hip bones in order to obtain bone marrow. A portion of my child's bone marrow will be taken and this will be no more than is necessary, usually between one and three pints. The procedure usually takes one to two hours. The bone marrow will be taken to a specialized laboratory where it will be processed and frozen. Two-three teaspoons of extra bone marrow may also be taken and used for research studies conducted in the Pediatric Bone Marrow Laboratory. These studies will not directly benefit my child but will hopefully benefit future children in need of bone marrow transplants. The risks to my child from the bone marrow harvest are: 1) the rare complication from general anesthesia, which include trouble breathing and the extremely rare threat of death; 2) bruising or skin infections at the bone marrow harvest area; and 3) pain at the harvest sites, which is usually most intense on the first 1–2 days after harvest. The removal of bone marrow is also accompanied by the loss of blood; therefore, during and after the procedure blood transfusions may be given. There is a very slight risk (<1%) of infection (such as hepatitis) from the transfusions.

. . . .

### Complications of the Procedure

There are six major complications from the bone marrow transplant procedure:

1) Complications related to low blood counts. These include anemia, for which blood transfusions will be needed; low platelet counts, which may result in severe bleeding and require platelet transfusions; and infection, which requires antibiotics.

2) Venoocclusive disease. This is a complication which stems from high doses of chemotherapy and/or radiotherapy. Patients who suffer this complication develop jaundice, liver function abnormalities, abdominal swelling and abdominal or shoulder pain, usually in the first month after transplant. Although many patients recover completely, venoocclusive disease can be fatal.

3) Recurrence of the disease. It is not possible to predict whether or not my child will be cured of the disease by the bone marrow transplant.

4) Failure of the bone marrow to "take" or engraft. It is possible that the transplanted bone marrow will not function, resulting in a prolonged period of low blood counts and the increased chances of consequential complications (see number 1, above), which could prove to be fatal. Use of the back-up marrow will be considered if there is no recovery of the bone marrow within six weeks.

5) Allergic reaction to the treated bone marrow. This can cause hives or skin rash, nausea, vomiting, wheezing and trouble breathing, and in extreme cases severe breathing difficulty. The chance of such an allergic reaction is 1–3%.

6) Interstitial pneumonia. Some patients suffer severe lung problems from either a viral infection, cytomegalovirus, or a reaction to the chemotherapy given. Although treatments are available, this form of pneumonia can be fatal.

. . . .

It is not possible to predict whether my child will benefit from this new treatment program. While it is possible that my child may sustain a very long remission and/or possibly be cured from his or her tumor, it is also possible that side effects from the bone marrow transplant procedure could prove fatal.

My insurance company may regard the bone marrow transplant as experimental or investigational, and refuse payment for

all or some of the cost of the procedure. If this happens, I will be responsible for the medical costs incurred from the transplant. *Participation in this study* is voluntary. No compensation for participation will be given. I am free to withdraw my consent for my child's participation in this treatment program at any time before transplant conditioning therapy (chemotherapy) begins or after the bone marrow is infused without prejudice to subsequent care. Refusal to participate will involve no penalty. If my child does not take part in or withdraws from the *study,* my child will continue to receive care.

Immediate necessary care is available if an individual is injured because of participation in a research project. However, there is no provision for free medical care or for monetary compensation for such injury. Further information concerning this and also my child's rights as a subject in a research *study* can be obtained from the Hospital Risk Management Office,....

Information on the result of this *study* can be obtained by contacting the attending physician on service in the Pediatric Hematology/Oncology Office,....

(All emphasis in the quoted portions of the Protocol and Consent Form have been added by the Court.)

The Plaintiff emphasizes that this consent form is required by the Hospital.

### AFFIDAVIT OF DR. DAVID WINSEMIUS, M.D., M.P.H.

The Defendant has provided the Court with an affidavit from Dr. David Winsemius, employed by M/M which states that he has worked with M/M as a physician in the Medical Care Unit for approximately 2 years and has reviewed approximately 40 cases involving ABMT treatment for cancer and that he has had formal academic training in the design, conduct, and analysis of clinical investigations and that he has consulted with a Board Certified Oncologist for his opinion about the proposed treatment plan for the Plaintiff, has referred the proposed treatment plan to two separate independent reviewers following the review by Dr. Hetzel (presumably the oncologist) both of whom indicated the proposed plan was experimental. Dr. Winsemius further stated that he indicated the treatment plan should be considered experimental and investigational as those terms are defined in the policy.

Dr. Winsemius further stated that every cancer treatment is subjected to three Phases before it becomes a recognized treatment for cancer and that once a treatment program has completed all three Phases for treating a form of cancer, the treatment is no longer considered to be experimental by the medical community. He further averred that it would not be ethical to continue Phase II testing of a treatment once it has been established from sufficient scientific data that such treatment is effective.

Dr. Winsemius further stated in Paragraph 10 of his affidavit:

10. I have reviewed the proposed treatment and current FDA approved product labelling, and I have read Dr. Friedman's affidavit. The reference in Dr. Friedman's affidavit to "FDA Approval" refers to the approval of a "Protocol" an experimental procedure. The FDA requires that all human investigations and experimentation be conducted under Investigational New Drug Protocols. The proposed treatment is not considered an FDA Approved treatment for general use, as is further shown by the Consent Form provided by Duke University Medical Center.

### THE INSURANCE CONTRACT

The group contract between Donald G. Watts and MassMutual specifically provides:

**General Medical Exclusions**

This plan's Medical Expense Insurance does not provide benefits for:

....

2. Services or supplies that the insurer determines are not medically required. To determine this, the insurer may rely upon the advice of medical peer review groups and other medical experts.

....

4. Charges for the use of any treatment, supply, device or facility which: (a) does not have such government approval as may be required; or (b) is

found by the insurer to be experimental, investigative or not generally accepted medical practice.

The policy further defines the terms Experimental or Investigation and Medically Required as follows:

**Experimental or Investigational**—means any service or supply for which there is not enough scientific data to establish it as safe and effective treatment for a given medical or dental condition. Charges for the use or any treatment supply device or facility will be considered experimental or investigational if it:

1. does not have government approval as may be required; or

2. is found by the insurer to be not in accordance with generally accepted medical and dental practice.

**Medically Required**—means a service or supply that meets all of the following requirements:

1. it is prescribed by a doctor; and

2. it is appropriate and consistent with the diagnosis; and

3. it is in accord with generally accepted medical practice; and

4. it could not have been left out without adversely affecting the covered person's condition or quality of medical or dental care.

### CONCLUSIONS OF LAW

 The standard preliminary injunction test enunciated in this Circuit in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (1977) has been summarized as follows:

... the trial court standard for interlocutory relief is the balance of hardship test. Four factors enter into the determination of whether to grant or withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest. There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If

the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify the issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if the injunction is not issued and likely harm to the defendant if an injunction is issued. If upon weighing them the balance is struck in favor of the plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

*North Carolina State Ports Authority v. Dart Containerline Co., Ltd.*, 592 F.2d 749 (4th Cir.1979). The task before the Court, therefore, is to apply the *Blackwelder* test to the motion for temporary restraining order and/or preliminary injunction in this case.

If the injunction in this case is granted, M/M will suffer irreparable injury in that it will in all probability lose all the funds it pays toward the treatment. More importantly, M/M will be open to claims for any other beneficiaries who wish to enter an experimental study in the hope of finding a cure.

If the injunction is not granted, the Plaintiff will not receive a treatment which the Plaintiff argues may be beneficial to him. However, as is stated in the Consent Form "It is not possible to predict whether the plaintiff will benefit from this 'new' treatment program." The Consent Form also states the complications and possible side effects from the procedure including but not limited to, venoocclusive disease which could be fatal, recurrence of the disease, interstitial pneumonia which can be fatal, low blood counts including anemia, potentially fatal damage to the lungs or liver or weakening of the heart muscle and cardiac arrest.

The Court cannot say that this Plaintiff will be irreparably harmed by *not* receiving the treatment. The protocol itself points out that "... while 12 of the 20 patients continue to show progression free survival, only three of the 12 have remission durations greater than one year, *making the follow-up too short to provide definitive conclusions.*"

(Emphasis added). The protocol also states "All the patients with recurrent disease following bone marrow transplant, except # 17, have died of their disease."

Even though Dr. Winsemius requested Dr. Friedman to provide any medical journals or articles to support the position that his treatment was not experimental, he did not provide any literature other than his letter, some medical records, the Protocol for the study, and the Consent Form. (Winsemius Aff. ¶ 6).

The protocol for the Phase II study refers to the Phase I study in a number of instances and in ¶ 2.0 under Purpose states:

2.0 *Purpose*

2.1 To further *study* the long-term disease-free survival of patients with recurrent or refractory brain tumors undergoing treatment with melphalan, 180 mg/m$^2$, and cyclophosphamide, 6.0 mg/m$^2$, with autologous bone marrow rescue.

2.2 To further *study* the toxicity of this regimen.

### THE MEDICAL REVIEW INSTITUTE OF AMERICA

The Medical Review Institute of America, Inc. analyzed the medical records for this Plaintiff and stated in substance:

The submitted material indicates that PNET is identical to neuroblastoma (NMS), that NBS is an approved indication for marrow ablative therapy with stem cell rescue (MAT/SR), and that this patient has PNET; thus if the policy permits MAT/SR for NBS, it should permit MAT/SR for this patient. In my opinion, this reasoning does not apply. First, the patient's diagnosis is said to be primitive neuroectodermal tumor (PNET), however, this term is controversial and complex. It covers several different diagnoses, which have in common that they are composed of malignant, immature neural or glial cells. Thus, the term "PNET" is broad, comparable to the term "leukemia." Each of these terms includes other more precise, but different, disease entities of different cell origin, often at different locations, having different prognoses and responding to different treatment modalities. Therefore, even though it is recognized that NBS fulfills some of the criteria for belonging to the PNET group, in particular in regards to cell morphology, it is also recognized that there are molecular, clinical and biological differences between NBS and all other PNET diagnoses, similar to the difference between acute lymphoblastic leukemia (ALL) and acute myeloblastic leukemia (AML). Both of these are acute leukemias, but each is a distinct entity in regards to prognosis and treatment.

Second, this patient's diagnosis is medulloblastoma (MBS), based on the pathology report. MBS is a subdiagnosis included in the term PNET. (NBS is also included sometimes, although that is controversial and not according to WHO's recommendation—see below.) However, even if you accept that NBS is included in the PNET group, it is in my opinion not appropriate to compare PNET tumors to NBS, as this could be considered equal to comparing AML to the term "leukemia." The appropriate comparison has to be between MBS and NBS, which would be similar to comparing AML to ALL for diseases included in the term "leukemias." There are major differences in the treatment strategies for MBS and NBS, as they do not only have different locations and origins, but they also are susceptible in varying degrees to different chemotherapy drugs. NBS has neurofilaments, originates from embryonic neural crest sympathogon cells, and is not located in the brain. MBS does not have any of these features. MBS originates from germinativa neuroepithelial cells, often in the roof of the fourth ventricle; has beta2-microglobulin; and is located in the cerebellum. NBS has none of these features.

. . . .

I can find fewer than five indexed papers reporting on fewer than 15 patients with MBS who were treated with MAT/SR from

1982 through 1994. Only three of these patients were reported to be "stable" 2 to 24 months after MAT/SR. In the protocol enclosed for review, it appears that nine patients with MBS, all without evidence of disease (NED) at the time of transplant, have been treated with MAT/SR, and that seven of these patients are in continued stage of having no evidence of disease 3 to 28 months after therapy. However, this experience has not been published in a peer-reviewed journal. It is of note that all of these patients were NED at the time of MAT/SR, and as it is recognized that the cure rate with "standard" therapy for MBS can be as high as 75%, with no further information, it is impossible to say whether the use of MAT/SR was appropriate for these patients. This patient appears to have residual/active disease, and the data from the protocol does not address the issue of MAT/SR for patients with residual/active disease. I know of no published or presented material suggesting that MAT/SR in patients with advanced/refractory MBS is curative. Thus, performing marrow ablative surgery and stem cell rescue (MAT/SR) in patients with NED or with active disease is unclear regarding the relative efficacy when compared to state-of-the-art non-marrow ablative therapy. I have found no evidence that MAT/SR is more curative than non-marrow ablative therapies and only anecdotal reports of possible benefit of using MAT/SR for patients with MBS. Thus, based on the evidence in the published literature on MAT/SR for MBS, such an approach for this patient would fit the criteria for being "experimental/investigational," as the efficacy of MAT/SR for MBS has not been well-documented in the literature as superior to non-marrow ablative approaches.

The Plaintiff argues that this disease is so rare that if M/M's claim that the treatment is "experimental," is accepted by the Court, M/M would not have to pay for any rare treatment. However, it is obvious that this is not treatment but an experimental and investigative study as is repeated many times in the protocol, and cannot be claimed to be medically required for this patient. Under the terms of the policy, "Experimental or investigative" means any service or supply for which there is not enough scientific data to establish it as a safe and effective treatment for a given medical condition.

At the hearing the Plaintiff's attorney proposed that the Court enjoin the Defendant to cover the cost of commencing the treatment and then if a different decision is later reached, to not enjoin any further cost. The Court believes this would be tragic for the Defendant and therefore declines to issue such an order.

In this case it is clear that the "patients," to use the terms of the protocol, are being "accrued" for the *study* and that once 20 patients have been accrued to the *study* "accrual will be suspended ... until it is clear that no more than two patients experience acute toxic events. Once it is determined that 0, 1, or 2 acute toxic events have occurred among the first 20 patients an additional 20 patients will be accrued onto the *study.*" "Protocol" is defined as "1. a clinical history. 2. Notes of various steps of an experiment." Gould's Medical Dictionary. "A protocol is a detailed written plan of an experiment using human subjects (a clinical trial) to be performed at a research and/or medical treatment site (See National Cancer Institute Investigator's Handbook)," *Harris v. Mutual of Omaha Companies and Rural Carrier Benefit Plan* Memorandum IP 92–1089–C U.S. District Court Southern District of Indiana, Indianapolis Division, P. 10, 1992 WL 421489, affirmed, 992 F.2d 706 (7th Cir. 1993).

Based upon the evidence before the Court at this stage of the proceedings this protocol is manifestly an experimental study. Therefore, the Defendant's determination that the proposed treatment by this protocol is experimental is not wrong or arbitrary or capricious.

The research being performed by Dr. Friedman and the other investigators at Duke is commendable and warrants all the financial assistance available by grant or donation. However, the Court is not free to ignore the law and order M/M to pay benefits on behalf of the Plaintiff to which the Court concludes the Plaintiff is not entitled under the provisions of the policy which provides his coverage.

The Court understands that the Plaintiff will find unacceptable any determination that the health policy he has does not cover the treatment outlined in the protocol procedure proposed for the Plaintiff. However, as much as the Court has sympathy for the Plaintiff in the matter before the Court, the Court must look to the provisions of his policy which provide the medical coverage for the Plaintiff and cannot ignore the evidence when applied to those provisions.

The irreparable damage clearly lies with the Defendant and likelihood of success by the Plaintiff in the underlying dispute is remote, based on the evidence now before this Court.

## *CONCLUSION*

When the evidence produced at this time is applied to the terms of the policy it is difficult to escape the conclusion that the procedure in this Protocol, recommended by the Plaintiff's treating physician, remains at this time in the investigational stage, is not an established procedure, and is excepted from coverage by the terms of the Plaintiff's policy.

**NOW, THEREFORE, IT IS ORDERED AND DECREED** that the Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction is *DENIED.*