Kimberly CROCCO

v.

XEROX CORP., et al.

No. 5:91–CV–779 (EBB).

United States District Court,
D. Connecticut.

Feb. 5, 1997.

Andrew Nemiroff, Epstein, Fogarty Cohen & Selby, Greenwich, CT, for plaintiff.

Marc L. Zaken, Cummings & Lockwood, Stamford, CT, Joyce A. Lagnese, Danaher, Tedford, Lagnese & Neal, Hartford, CT, for defendant.

### MEMORANDUM OF DECISION

ELLEN B. BURNS, Senior District Judge.

The plaintiff in this civil action, Kimberly Crocco, was an employee of defendant Xerox Corp., a maker of office equipment. Defendant Patricia Nazemetz is the administrator and fiduciary of Xerox's employee benefits plan and a management-level employee of the company. Defendant American Psych-management (APM) is a corporation that reviews the mental health treatment of benefit plan participants to determine eligibility for reimbursement. Crocco has brought this suit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, because APM and Nazemetz have refused to authorize reimbursement for expenses she incurred as an inpatient at the Rye Psychiatric Hospital Center.

The suit was tried to this court on September 24 and 25, 1996. After reviewing the testimony at trial and the administrative record available to Nazemetz, the court finds that Crocco's claim did not receive a full and fair review by the plan fiduciary, as required

by ERISA. The court remands the claim to Nazemetz for further consideration.

## I. FINDINGS OF FACT

### A. ADMINISTRATION OF THE XEROX EMPLOYEE BENEFITS PLAN

At the time of the events at issue here, Xerox's employee benefits plan (the Plan) was governed by the "Xerox Medical and Dental Care and Long Term Disability Income Plan 1988 Restatement (the Restatement)." (Pl.'s Ex. 6). According to this document, the Plan is to be administered by Nazemetz, "who shall serve at the pleasure of the chief executive officer of the Company." (Pl.'s Ex. 6, § 11.1). Her powers include the authority "to promulgate any uniform rules, regulations and schedules of general applicability and to adopt such forms which she deems necessary in order to carry out the purposes of the Plan, or to interpret the terms and conditions of the Plan ..." (*Id.*, § 11.3). Section 11.4 of the Restatement reiterates that "the Plan Administrator may ... construe the Plan and the Trust Agreement ..." The document also gives Nazemetz the power to "[p]rovide for the allocation of fiduciary responsibilities ... [and] prescribe rules and procedures for allocation of fiduciary responsibilities among the agents appointed by her." (*Id.*, §§ 11.4 and 11.6).

The broad discretion that the Restatement grants Nazemetz is tempered by the general requirement that she "act solely in the interest of the participants in the Plan and ... [f]or the exclusive purpose of providing benefits to the participants." (*Id.*, § 11.5). In language that tracks ERISA, 29 U.S.C. § 1133(2), the Restatement also requires that any participant whose claim for benefits has been denied be given a "full and fair review by the Plan Administrator of the decision denying the claim." (*Id.*, § 11.8). Finally, the document forbids Nazemetz to "delegate any of her discretionary authority to interpret the Plan ..." (*Id.*, § 11.1)

### B. THE RELATIONSHIP BETWEEN XEROX AND APM

Xerox's employee benefits plan is self-funded, which means that Xerox pays claims made by employees out of its own revenues. Some time prior to January 1988, Xerox became concerned about the effect that rapidly increasing health care costs might have on its ability to fund a full benefits package for its employees. The company was particularly worried about the cost of mental health treatment, which was rising by more than 20% a year (Test. of Nazemetz, p. 102). At the same time, Xerox wanted to change its process for reviewing employee mental health treatment to ensure that issues of medical necessity were handled prospectively rather than retrospectively; that is, it wanted Plan participants to seek prior approval for treatment, in order to avoid situations in which employees incurred expenses only to find out later that they could not be reimbursed.

In January 1988, Xerox hired APM to provide pre-admission and concurrent review—"case management"—of mental health treatment covered by the Plan. Xerox's employees were informed of APM's new role in a "Benefits Update," issued in December 1987. (Pl.'s Ex. 5). According to the update, employees or their therapists were required to contact an APM reviewer before beginning treatment. The reviewer would examine the therapist's treatment plan and either approve or deny coverage. If a therapist recommended inpatient care, and the reviewer concurred, APM would "certify" coverage for a specific number of days in the hospital. The update warned employees that "[i]f you do not adhere to the certified treatment plan, you are responsible for all charges that are incurred for treatment beyond or in addition to what was certified." (*Id.*, p. 3). The update also informed participants that they were entitled to appeal a reviewer's decision to deny coverage. It said that, in case of a dispute, APM would assign a physician to reconsider the denial, and, if the participant remained dissatisfied after this review, APM would bring the matter to its Medical Appeals Committee for "a final decision." (*Id.*, p. 4).

In the preamble to the "Case Management Agreement" (the Agreement) between Xerox and APM, the companies agree that "case

management offers an opportunity to enhance the quality of care while improving utilization rates." (Pl.'s Ex. 8, p. 1). They also agree that "it is in the best interest of Xerox and its employees to reduce inpatient and outpatient mental health care costs ..." (*Id.*). In pursuit of these goals, APM promises to provide review services by "a team of experienced, licensed psychiatric nurses, board-certified psychiatrists and clinical psychologists using objective, field-tested criteria for the purpose of determining medically necessary and appropriate treatment of an eligible individual's diagnosed condition." (*Id.*, ¶ I.B.). In exchange, Xerox agrees to pay APM a fee per Plan participant. In her testimony, Nazemetz explained that Xerox chose this per capita compensation arrangement because "we didn't want to create an incentive for [APM] to provide more case management or less case management; we wanted them to do the right amount of case management." (Test. of Nazemetz, p. 113). However, Xerox did meet with APM on a quarterly basis to review activity under the Plan, and two of the factors the company looked at were the level of growth in spending and the extent to which treatment was shifting from inpatient to outpatient care. (*Id.*, pp. 113–15, 200–01).

The Agreement between Xerox and APM made clear that APM was not assuming Nazemetz's fiduciary obligation to provide a full and fair review of claim denials. According to ¶ II.A. of the Agreement, "Xerox agrees that APM's determinations as to the appropriateness and/or medical necessity of hospital admissions, lengths of stay or outpatient treatment are advisory only and that all final determinations as to the payment of benefits are solely the independent responsibility of Xerox."

## C. CROCCO'S HOSPITALIZATION AND THE REVIEW BY APM

In January 1990, Kimberly Crocco asked Xerox's Employee Assistance Program for help in coping with depression related to her working conditions at Xerox. She was referred to a therapist at the Greenwich Family Center, who suggested she seek advice about inpatient treatment from her former therapist, Dr. Jack Schoenholtz, medical director of the Rye Psychiatric Hospital Center (Rye). On February 2, 1990, Crocco was admitted to Rye for treatment of major depression, which was manifested, in part, by thoughts of suicide.

From the start, APM's efforts to evaluate the medical necessity of Crocco's hospitalization led to tension and misunderstanding between Crocco and her psychiatrist, on the one hand, and APM, on the other. In Crocco's admission notes, Schoenholtz reports that the plaintiff was angered by her Greenwich therapist's contact with APM, which she felt violated her privacy. (Pl.'s Ex. 17, Medical Records, Admission Records/Evaluations, p. 3). Crocco also signed a form, supplied by Rye, which forbade the hospital to provide information to a managed care company unless the company agreed to assume responsibility for any harm the patient might suffer as a result of case management. When APM refused to assume this responsibility, Rye refused to release information about Crocco's case, and, for several weeks, APM was unable to authorize reimbursement for her treatment.

This deadlock over coverage quickly became an emotional issue for the plaintiff. Between February 25 and March 28, 1990, Schoenholtz recorded 17 progress notes in Crocco's file; no less than seven were devoted to her anger over the dispute with APM. (Pl.'s Ex. 17, Doctor's Progress Notes). On February 28, the patient went so far as to write a two-page, single-spaced letter to Xerox's chairman and C.E.O., in which she complained about APM and managed care. It was this letter that first alerted Nazemetz to the dispute between Crocco and APM.

Some time prior to March 22, 1990, Crocco broke the deadlock by withdrawing her demand that APM assume responsibility for the results of its managed care decisions. On March 30, Rye sent APM the plaintiff's medical records through March 28, and the company assigned the case to psychiatrist Paul Prunier for initial review. Prunier read the medical records and telephoned Schoenholtz twice, in an effort to conduct APM's standard telephone review. During the first conversation, on April 5, Schoenholtz turned

the phone over to Crocco, ostensibly to allow Prunier to determine the state of her health directly. Crocco made an appeal for reimbursement, and the conversation ended. On April 11, the two psychiatrists spoke again, this time for about 30 minutes, but Prunier did not consider this conversation helpful either. Ultimately, he felt constrained to base his reimbursement decision on the written medical records supplied by Rye. (Def. Ex. A, Physician Reviewer Report, p. 1).

On April 5, 1990, after the first conversation with Schoenholtz but before the second, Prunier decided that Crocco's hospitalization expenses should be reimbursed only for the period February 2 to March 3, 1990. (*Id.*). Prunier decided to cut off coverage after March 3 because, on that date, Crocco appeared to have been given an "ad lib" pass to leave the grounds of the hospital at will, so long as she kept to her schedule of inpatient therapy. As Prunier noted in his report:

> Up to that date the patient had already been granted 'grounds privileges' (on 2–2), 'group passes' (on 2–3), 'off-grounds passes' (on 2–9) and a '3–hour pass' with her mother on (2–24) [sic]. Such a progression of passes is a common mechanism for transitioning the patient to a less restrictive setting, in this case her return home. With the order for 'ad lib outside activities' it appears to this reviewer that acute care hospitalization is no longer medically necessary.

(*Id.*, p. 2). Although Prunier discussed the issue of passes with Schoenholtz in their April 11 conversation, (Pl.'s Ex. 20, Letter of April 16, 1990 from Schoenholtz to Kearns, p. 3), he apparently saw no reason to change his decision or make any additions to his report.

Prunier's report also provides further evidence of the hostility between Schoenholtz and APM. He noted that in hundreds of previous telephone reviews, no attending physician had ever put a patient on the phone before, and he expressed his view that "such behavior is deleterious to the patient." (Def.'s Ex. A, p. 3). Prunier believed that Schoenholtz might even be endangering Crocco's life through his hostility to managed care:

> This doctor [Schoenholtz] has indicated his discomfort with taking responsibility for the care of this patient (by his request of me to share in that responsibility as a condition for his providing clerical information). He appears to act out his discomfort and to, *at least* potentially, increase the likelihood that the patient might act out (for example, in the extreme, she might suicide).

(*Id.*) (Emphasis in the original).

In a letter dated April 12, 1990, APM informed Schoenholtz and Crocco of Prunier's decision to deny coverage beyond March 3. The letter did not explain why March 3 was chosen as the cut-off date for reimbursement, but it did note that "APM attempted to conduct a telephone review with you [Schoenholtz] on two occasions (4/5/90 and 4/11/90) to determine if additional days could be certified beyond 3/3/90. However you were not willing to provide sufficient clinical information required to conduct a review." (Pl.'s Ex. 19, Letter of April 12, 1990 from APM to Schoenholtz, p. 1).

Schoenholtz responded to this notice with a long letter to Xerox's chairman and C.E.O., in which he denied that he had refused to cooperate with APM and gave his own version of his conversations with Prunier. This letter was passed on to Nazemetz, who contacted APM. In a letter to Nazemetz's office, Dr. Daniel Patterson, APM's Director of Medical Affairs, reiterated APM's complaints about Crocco and Rye's initial demand for indemnification and Schoenholtz's lack of cooperation. He concluded by noting that "our case managers, their supervisors, and Dr. Prunier demonstrated grace and prudent judgement under considerable pressure and provocation." (Pl.'s Ex. 22, Letter of May 4, 1990 from Patterson to Starr, p. 2).

On May 8, 1990, Dr. James Evans, an APM physician advisor, conducted a "Level I" appeal of Prunier's decision. The appeal consisted of a telephone conversation with Dr. Schoenholtz. On May 14, Evans wrote to Schoenholtz and Crocco informing them that he was affirming the decision to deny coverage beyond March 3. Evans explained that "our physician advisors have determined that any medical treatment and services re-

quired could be provided in a setting other than an inpatient acute care hospital." (Pl.'s Ex. 23, Letter of May 14, 1990 from Evans to Schoenholtz).

On May 21, 1990, Crocco, who was still hospitalized, requested a "Level II" appeal of the decision to deny coverage. In order to conduct this appeal, APM requested Crocco's medical records for the period after March 28 (the last date for which Rye had supplied records), but Crocco refused to provide them. In a subsequent letter, Crocco's attorney explained that because "the complete disclosure of records through March 28, 1990 produced no result, there seems to be no purpose in further eroding Ms. Crocco's privacy by providing additional medical records." (Pl.'s Ex. 33, Letter of September 10, 1990 from Nemiroff to O'Brien). On June 4, 1990, Nazemetz wrote to Crocco to express her concern about the serious financial risk she was incurring by remaining in the hospital beyond the date APM had certified. She told Crocco that, if she provided additional records, APM would conduct a Level II appeal, but that no payments would be made beyond what APM certified. The next day, Crocco left Rye.

On September 10, 1990, Crocco, through her attorney, asked that APM conduct a Level II appeal. Xerox told APM to conduct the review for the entire March 4 to June 5 period, even though medical records were available only through March 28. On September 24, 1990, Patterson, in his capacity as chairman of the Level II Appeal Committee, informed Schoenholtz that Crocco's appeal had been denied. He explained that "[n]either the severity of the patient's symptoms, nor the intensity of service required for treatment justified continued certification at the acute level of care requested." (Pl.'s Ex. 35, Letter of September 24, 1990 from Patterson to Schoenholtz).

### D. THE ERISA REVIEW CONDUCTED BY THE PLAN FIDUCIARY

On October 23, 1990, Crocco requested that Nazemetz, as the Plan's fiduciary, conduct a review of APM's denial of benefits, as required by ERISA, 29 U.S.C. § 1133(2). According to her testimony, Nazemetz discussed the case with an assistant and Xerox's ERISA counsel, and she reviewed the administrative record. Nazemetz's most important source of information was a phone meeting with an account manager at APM, whom she had asked "to gather all the facts on the case and to be able to convey to me in a formal way a basis for the decision of their Level II appeal." (Test. of Nazemetz, p. 152). Nazemetz testified that the purpose of the phone meeting was to determine that proper procedures had been followed; to find out "whether there was anything else I should be considering as I took a look at the whole process;" and "to assure myself that [APM] had good, sound reasoning for coming to the conclusions that they did." (*Id.* at 155 and 156).

According to Nazemetz, the account manager explained that the reason coverage had been denied after March 3 was that Crocco "had fairly little supervision during her hospital stay" and "that she had been given ... ad lib passes ... that pretty much gave her the ability to move on and off campus at will and, therefore, was not receiving any intense level of medical care ..." The account manager also told Nazemetz that "the record contained numerous references to Kim functioning very well, showing bright affect, making positive self statements, and engaging appropriately in normal activities of daily living." (Pl.'s Ex. 41, Letter of December 3, 1990 from Jeffrey to Starr, p. 2; *See also* Test. of Nazemetz, p. 158). In addition, the APM employee informed Nazemetz that Schoenholtz "was not cooperative in the review process, focusing primarily on his objections to managed care." (Pl.'s Ex. 41, p. 1).

Despite clear evidence of hostility between Crocco's psychiatrist and APM, Nazemetz did not seek information from Crocco, Schoenholtz, or from any other source but APM. Nor did she even consider obtaining the opinion of a third-party expert. (Test. of Nazemetz, p. 206). Nazemetz also failed to examine Crocco's medical record, even though it was available to her. She explained that

it's not my practice to do that. I am not a doctor and wouldn't necessarily be able to add any value in reviewing medical records, and, ... based on the facts that were relayed to me by [the APM account man-

ager] and in other correspondence from APM, I felt they had used sound judgment in coming to the conclusion that they had.... [T]he purpose of engaging APM in this particular case, or any expert organization in other instances, is to ensure that we have the best level of expertise being applied to the review of these situations.... We tried to ensure that we had a supplier, vendor, a partner, who would really bring a higher level of expertise, and my role and responsibility is to ensure that they are acting in the way that they were supposed to be acting and doing the things we engaged them to do, and in this particular case, I was satisfied that they had done that.

(Test. of Nazemetz, pp. 156–57 and 162–63).

Although Nazemetz failed to examine Crocco's medical records, they are part of the administrative record, and they do contain information that would have caused a reasonable person to make further inquiry regarding APM's decision. For example, the Doctor's Progress Notes for March 5, 1990, state that "Pt [patient] had setback & meds [medications] not working yet. Crying, tearful & feeling 'abandoned.'" (Pl.'s Ex. 17). The entry for March 9 reads: "Pt less angry today but having vivid defensive dreams. Medication seems stable at this level re side effects. Will increase as necessary." (*Id.*). On March 12, Schoenholtz noted that "Pt. had very bad Sunday. Meds not producing negative side effects but she was tearful during session." (*Id.*). The March 17 note reports a "[v]ery tearful session," and Schoenholtz appears to have ordered a change in medication. (*Id.*). Finally, on March 23, Schoenholtz writes that the "[s]essions revealing much greater affective swings. Tearfulness, laughing, silence, voluble talkativeness (? Bipolar?)." (*Id.*) By failing to read the medical record, Nazemetz missed information that should have caused her, at the least, to question the explanation she received from the APM account manager.

Based solely on the information provided by APM, Nazemetz concluded that "[a]ll the facts in this particular case seem to point out that medical necessity was not proven ..." (Test. of Nazemetz, p. 162). On November 29, 1990, she informed Crocco that her ERISA appeal had been denied and provided the following explanation:

Please note that treatment which is not certified by [APM] is not eligible for reimbursement under the Plan. Since APM determined that the level of acute care provided to Kimberly was inappropriate for reimbursement after March 3, 1990, such treatment was not certified and therefore, is ineligible for reimbursement under the Plan.

(Pl.'s Ex. 40, Letter of November 29, 1990 from Nazemetz to Nemiroff, p. 2).

## II. CONCLUSIONS OF LAW

### A. IS APM A PROPER DEFENDANT?

■ In *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir.1989), the Second Circuit held that, under 29 U.S.C. § 1132(d)(2), "only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." Despite this ruling, Crocco argues that APM is a proper defendant in this case because it is a plan fiduciary. She bases this claim on 29 U.S.C. § 1002(21)(A), which defines a fiduciary as anyone who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets ... or ... has any discretionary authority or discretionary responsibility in the administration of such plan." However, Crocco has neglected to consider the interpretation that the Department of Labor has given this definition. According to 29 C.F.R. § 2509.75–8.D–2 (Interpretive Bulletin Relating to ERISA), "a person who performs purely ministerial functions" is not a fiduciary under 29 U.S.C. § 1002(21)(A). Among the functions that the Labor Department considers ministerial are "[a]pplication of rules determining eligibility for participation or benefits ... [p]rocessing claims; and [m]aking recommendations to others for decisions with respect to plan administration." 29 C.F.R. § 2509.75–8.D–2. The department explains that a person performing these roles "within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a

fiduciary because such person does not have discretionary authority or discretionary control ..." *Id.*

The status under ERISA of organizations similar to APM has been raised in several cases, and the precedents support an interpretation of the statute that would free APM of fiduciary responsibility. For example, in *Klosterman v. Western General Management, Inc.,* 32 F.3d 1119 (7th Cir.1994), the Seventh Circuit considered a suit against a claims administrator—Western General—that was responsible for initial claims determinations. The Court of Appeals ruled that the company was not a fiduciary because "[the employer], not Western General, retained the authority to make the ultimate decisions in all doubtful or contested claims and all claims in which legal actions were proceeding." *Id.* at 1124. Similarly, in *Protocare of Metropolitan N.Y., Inc. v. Mutual Assoc. Administrators, Inc.,* 866 F.Supp. 757, 762 (S.D.N.Y.1994), a court in this circuit found that a claims administrator was not a fiduciary because it merely applied the rules determining eligibility for benefits and had no power to set plan policy or procedures. *See also Harris Trust & Savings Bank v. Provident Life & Accident Ins. Co.,* 57 F.3d 608, 613 (7th Cir.1995); *Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.,* 990 F.2d 513, 517–18 (9th Cir.1993); *Colleton Regional Hosp. v. MRS Med. Review Sys., Inc.,* 866 F.Supp. 896, 900 (D.S.C.1994).

Although Crocco points to several documents that appear to indicate that APM had the authority to make final determinations of claims, the Plan and the Case Management Agreement between Xerox and APM make clear that ultimate authority remained in the hands of Nazemetz and Xerox. Section 11.1 of the 1988 Plan Restatement forbids Nazemetz to delegate "any of her discretionary authority to interpret the Plan." (Pl.'s Ex. 6). Section 11.8 of the same document says that the claim administrator shall "afford a reasonable opportunity to any Participant whose claim for benefits has been denied to a full and fair review by the *Plan Administrator* of the decision denying the claim." (*Id.*) (Emphasis added). Finally, in the contract between the two companies, Xerox agrees

that APM's benefit determinations "are advisory only and that all final determinations as to the payment of benefits are solely the independent responsibility of Xerox." (Pl.'s Ex. 8, p. 3).

In light of the case law, the facts presented at trial, and the Labor Department's interpretation of the statute, the court finds that APM was not a plan fiduciary and cannot be sued under ERISA.

**B. IS XEROX A PROPER DEFENDANT?**

■ Xerox argues that the only role it plays in this case is that of Crocco's employer, and, therefore, under *Leonelli,* it is not a proper party to her suit. However, several courts have held that an employer can be sued in an ERISA benefits case, if it has been "shown to control administration of a plan." *Daniel v. Eaton Corp.,* 839 F.2d 263, 266 (6th Cir.1988); *Law v. Ernst & Young,* 956 F.2d 364, 372–73 (1st Cir.1992); *see also Curcio v. John Hancock Mutual Life Ins. Co.,* 33 F.3d 226, 234 (3rd Cir.1994). The question for this court is whether Xerox's own discretion and its authority over Nazemetz were sufficient to give the company administrative control over the Plan.

The 1988 Restatement of the Xerox Plan gives the company "the right to amend, suspend or terminate the Plan," (Pl.'s Ex. 6, § 12.1), and it retains the authority to communicate the terms and conditions of the Plan to employees. (*Id.,* § 13.2). Nazemetz is a Xerox executive, who is compensated by the company, not the Plan, (*Id.,* § 11.7), and she serves as Plan Administrator "at the pleasure of the chief executive officer of the Company." (*Id.,* § 11.1). If Nazemetz is sued successfully for her actions on behalf of the Plan, Xerox must reimburse her. (*Id.,* § 11.9). The Company retains the right to appoint claims administrators, (*Id.,* § 11.2), and it was, in fact, a party to the agreement setting out APM's duties under the Plan. (Pl.'s Ex. 8). That agreement names Xerox, not the Plan Administrator, as the party with final, independent responsibility for determining benefit payments.

In *Adamo v. Anchor Hocking Corp.,* 720 F.Supp. 491 (W.D.Pa.1989) and *Ansari-*

**138**

*Springs v. Caterpillar, Inc.,* No. C–94–0742 MHP, 1995 WL 27525 (N.D.Cal., Jan. 19, 1995), district courts held that a plaintiff's employer could be sued for benefits under ERISA if its role as employer of the plan administrator gave it indirect control over the plan. The *Ansari–Springs* opinion was careful to note that a company executive can serve as plan administrator without converting her employer into a plan fiduciary, so long as she is "established in a separate, truly autonomous role free from [company] control." 1995 WL 27525 at *3. In the case at bar, the provisions of the Plan cited above indicate that Nazemetz lacked the requisite autonomy, and the court finds that Xerox had sufficient control over administration of the Plan to make it a proper defendant in this suit.

## C. STANDARD OF REVIEW

When a benefits plan gives its administrator discretion to construe plan provisions, courts may intervene in a claim decision only if the administrator has acted arbitrarily and capriciously. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Miller v. United Welfare Fund,* 72 F.3d 1066, 1070–71 (2d Cir.1995). In *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1269–70 (2d Cir. 1995), the Second Circuit said that language empowering a plan administrator to "pass upon all questions concerning the application or interpretation . . . of the Plan" provided sufficient discretion to require the arbitrary and capricious standard. The Plan at issue here grants Nazemetz the power "to interpret the terms and conditions of the Plan," and to "[c]onstrue the Plan . . ." (Pl.'s Ex. 6, §§ 11.3 and 11.4). In light .of these provisions, the court must apply the arbitrary and capricious standard of review to Nazemetz's decision to deny Crocco's claim.

The arbitrary and capricious standard is a narrow one that requires the court to ask " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (*quoting Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)); *Miller,* 72 F.3d at 1072. When applying the arbitrary and capricious standard, the court must limit its inquiry to evidence that was in the administrative record available to the plan administrator. *Miller,* 72 F.3d at 1071. In *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956–57, the Supreme Court noted that one factor to be weighed in determining whether a decision was arbitrary and capricious was the existence of a conflict of interest on the part of the fiduciary. But under Second Circuit precedent, the mere fact that the fiduciary works for the employer that funds the plan does not, in and of itself, create a conflict of interest. *Jordan,* 46 F.3d at 1274.

## D. THE REQUIREMENTS OF ERISA

Under ERISA, the proscription against arbitrary and capricious benefits decisions is embodied in the requirement that "the appropriate named fiduciary" provide a "full and fair review" of denied claims. 29 U.S.C. § 1133(2). According to 29 C.F.R. § 2560.503–1(g)(2) and § 11.8 of Xerox's 1988 Restatement,[1] the named fiduciary in this case was Nazemetz, and the court's central inquiry is whether or not she fully and fairly reviewed APM's denial of Crocco's claim for benefits.

The most widely accepted criteria for determining what constitutes a full and fair review under ERISA were set out by the Third Circuit in *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813,* 715 F.2d

---

1. 29 C.F.R. § 2560.503–1(g)(2) states in relevant part: " '[T]he appropriate named fiduciary' for purposes of this section may be the plan administrator or any other person designated by the plan, provided that such plan administrator or other person is either named in the plan instrument or is identified pursuant to a procedure set forth in the plan as the person who reviews and makes decisions on claim denials." Section 11.8 of the Restatement names Nazemetz as the person responsible for providing a full and fair review of claim denials.

853 (3d Cir.1983).[2] The Third Circuit began its analysis by noting that "'full and fair review' must be construed not only to allow a pension plan's trustees to operate claims procedures without the formality or limitations of adversarial proceedings but also to protect a plan participant from arbitrary or unprincipled decision-making." *Id.* at 857. The Court then set out the following criteria:

> [T]he plan's fiduciary must consider any and all pertinent information reasonably available to him. The decision must be supported by substantial evidence. The fiduciary must notify the participant promptly, in writing and in language likely to be understood by laymen, that the claim has been denied with the specific reasons therefor. The fiduciary must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence. If the fiduciary allows third parties to appear personally, the same privilege must be extended to the participant.

*Id.* at 857–58. In regard to the first criterion, the Court explained that "the decision-maker [must] consider the evidence presented by both parties prior to reaching and rendering his decision." *Id.* at 858, n. 5.

### E. THE APPLICATION OF *GROSSMULLER* TO THE DENIAL OF CROCCO'S APPEAL

■ There can be no doubt that the steps taken by Nazemetz herself did not constitute a full and fair review of Crocco's case. In her testimony, she said the only objective of her review was to determine whether APM had followed proper procedures and reached a decision that was reasonable on its face. She made no independent effort to determine whether that decision was correct—she did not speak to Crocco or her psychiatrist, she did not look at the medical record, and she did not even consider seeking the advice of a

third party. It would be impossible to construe Nazemetz's actions, standing alone, as a consideration of "any and all pertinent information reasonably available" or an examination of "the evidence presented by both parties." *Grossmuller*, 715 F.2d at 857–58.

Nazemetz argues, however, that it would have been senseless for her, a layperson, to pretend to review medical decisions. She asserts that she hired APM, with its psychiatric expertise, to conduct full reviews of claims for mental health benefits, and she was not required to do anything but ensure that APM had followed proper procedures and reached a facially reasonable decision. While it is true that APM conducted an initial review and two appeals, that it spoke to Crocco's attending physician, and that it examined the medical record, the court does not agree that APM's actions absolved Nazemetz of her legal responsibility, as plan fiduciary, to conduct her own full and fair review of Crocco's claim.

ERISA's implementing regulations require that a full and fair review be conducted by "an appropriate named fiduciary or ... a person designated by such fiduciary." 29 C.F.R. § 2560.503–1(g)(1). In the case at bar, the Plan named Nazemetz as the person responsible for providing a full and fair review of claim denials, and it forbade her to delegate any of her discretionary authority to interpret Plan provisions. Moreover, APM specifically avoided a fiduciary role by including in its contract a clause leaving Xerox with sole responsibility for final determinations of benefits. In this respect, it is instructive to contrast APM's legal position with that of the claims administrator in *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279 (9th Cir.1990), which involved issues similar to those before this court. In *Madden*, the plan administrator designated the Metropolitan Life Insurance Co. as a fiduciary through a Claims Adminis-

---

**2.** Three other circuits have adopted the *Grossmuller* criteria. *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir.1994); *Sage v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885, 893–94 (10th Cir.1988); *Brown v. Retirement Comm. of the Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir.1986). Within this circuit, the *Grossmuller* standard was

adopted by the District Court in *Miller v. United Welfare Fund*, 851 F.Supp. 71, 74 (E.D.N.Y. 1994). Upon appeal, the Second Circuit agreed that the defendant acted arbitrarily and capriciously, but did not specifically address the issue of what constitutes a full and fair review. *Miller*, 72 F.3d at 1073.

tration Agreement that specifically granted MetLife " 'fiduciary responsibility for provision of full and fair review of claim denials.' " *Id.* at 1284 (quoting the Claims Administration Agreement). Having failed to make a similar designation of authority—or having been prevented from doing so by the terms of the Plan—Nazemetz cannot now argue that *APM's* review and appeals process constitutes "a full and fair review by *the appropriate named fiduciary.*" 29 U.S.C. § 1133(2) (Emphasis added).

It is true that 29 C.F.R. § 2509.75–8.FR–11 (Interpretive Bulletin Relating to ERISA) allows a plan fiduciary to "rely on information, data, statistics, or analyses furnished by persons performing ministerial functions for the plan ..." [3] However, it would be illogical to allow fiduciaries to extend this reliance to disputes over claims that have been denied by the ministerial body. ERISA requires the appropriate named fiduciary to "consider the evidence presented by both parties." *Grossmuller,* 715 F.2d at 858. For the purposes of the ERISA appeal, the two "parties" in this case are Crocco and APM. Clearly, Nazemetz cannot be allowed to rely solely on APM's analysis of Crocco's claim when the whole dispute revolves around the accuracy of that analysis. Logic, fairness, and ERISA require that Nazemetz do more than check APM's procedures and the superficial rationality of its decision.

The importance of a full and fair review of claim denials by a person with fiduciary responsibilities toward participants is well demonstrated by this case. The administrative record before the court is replete with examples of hostility between Crocco's physician and APM. There is also evidence that APM was operating under a conflict of interest. Nazemetz testified that APM was hired to control mental health care expenditures and that Xerox regularly reviewed APM's success in containing costs and shifting treatment from inpatient to outpatient care. While it may be true that the fee arrangement between APM and Xerox did not encourage the denial of coverage, APM's desire to satisfy

Xerox's expectations certainly did. Of course, Nazemetz herself may have been operating under a similar conflict, but she had assumed a fiduciary responsibility to act in the best interest of Plan participants while APM had specifically abjured this responsibility. In light of the hostility evident in the record and APM's potential conflict of interest, the cursory and one-sided review that Nazemetz conducted did not meet the requirements of ERISA.

The court is not impressed by Nazemetz's claim that she lacked the medical knowledge to make an independent review of Crocco's case. The fact of the matter is she did make a medical decision: She listened to the medical opinion of one side, decided that "[a]ll the facts ... seem[ed] to point out that medical necessity was not proven," (Test. of Nazemetz, p. 162), and denied the claim. There is no reason why she could not have sought similar information from Crocco and her psychiatrist and then made an informed and fair "medical" decision, as required by ERISA. It is exactly this type of choice, between the conflicting opinions of experts, that judges, juries, and patients must make every day in courtrooms and hospitals.

The defendants cite three cases to support their claim that Nazemetz's review meets ERISA standards, but the court does not agree that these cases require the result suggested by the defendants. The first case is *Miller,* in which the Second Circuit decided that the plan fiduciaries had failed to perform an adequate review of the claim administrator's denial of reimbursement. As the defendants point out, the Court reached this result partly because the plan fiduciaries, unlike Nazemetz, had failed to consult medical experts. However, nowhere does the Court suggest that such consultation provides a safe harbor for persons conducting ERISA reviews. When a plan participant disputes the opinion of non-fiduciary experts, ERISA requires that *the appropriate named fiduciary* give fair consideration to both sides of the case. The *Miller* Court recog-

---

**3.** 29 C.F.R. § 2509.75–8.FR–11 interprets 29 U.S.C. § 1104(1)(B), which requires fiduciaries to act with the care, skill, prudence, and diligence that a prudent man would use in similar

circumstances. It does not apply specifically to the full and fair review required by 29 U.S.C. § 1133(2).

nized this requirement when it ordered that the case be remanded to the fiduciary "for reconsideration in the light of *evidence presented by both sides*." 72 F.3d at 1074 (Emphasis added).

The second case cited by the defendants is *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir.1994). In this case, the plan fiduciary, MetLife, denied Donato's claim for disability benefits, after independent medical consultants twice reviewed and rejected the claim. As part of their review, the medical consultants examined the opinions of Donato's three physicians, who had concluded that she was disabled. According to the Court, the fiduciary's decision "simply came down to a permissible choice between the position of UMAC, MetLife's independent medical consultant, and the position of Ms. Donato's clinical ecologists ..." *Id.* at 380. The critical element in the *Donato* opinion is the Court's assumption that the fiduciary actually made a choice; that is, the Court assumes MetLife considered both sides before deciding to deny Donato's claim. In the case before this court, Nazemetz uncritically accepted the opinion of her medical reviewers, without examining the medical record or soliciting the views of Crocco's physician. This does not qualify as "a permissible choice" between expert opinions.

The final case cited by the defendants is *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594 (5th Cir.1994). Although the disability claim in this case was reviewed by independent medical consultants, the Court emphasized the role that the plan fiduciary, MetLife, played in the determination of the claim:

> MetLife considered all of the medical records Sweatman submitted in support of her disability claim, contracted independent medical consultants to evaluate those records and determine whether they supported her physical limitations, hired an investigator to interview and investigate Sweatman, and reviewed the entire administrative record twice.... MetLife, not [the medical consultants], was responsible for the ultimate determination of whether Sweatman was 'totally disabled.' ... In fact, had MetLife delegated its decision to

grant or deny disability benefits to [the medical consultants], it might have run afoul of its fiduciary duty under the plan. *Id.* at 601–02 and 603. MetLife's thorough review of the medical and administrative records contrasts decisively with Nazemetz's inquiry into the procedural propriety and facial rationality of APM's determination.

In its Post–Trial Memorandum, p. 4, APM also offers a policy argument in support of Nazemetz's actions. APM acknowledges that Nazemetz "relied on [APM's] advisory determinations," even though the company had never assumed fiduciary responsibility, but it denies that, in so doing, she abdicated her responsibility under ERISA. Instead, APM characterizes Nazemetz's action as a permissible exercise of "independent supervisory authority over the certification process." (*Id.*). It then argues that:

> [t]here is an important distinction between the exercise of such independent authority and mastery of the medical details of every benefit decision. If, as plaintiff implicitly suggests, the law were to require that Plan Administrators such as Ms. Nazemetz personally vouch for such medical details, there would be little point to retaining experts such as APM here and the efficient administration of such plans would be fatally compromised.

(*Id.*). The court rejects APM's argument for two reasons. First, in deciding that Nazemetz failed to conduct a full and fair review, the court does not insist that she master the medical details of the case. It requires only that she examine the medical record in order to determine whether it raises questions that should be clarified prior to rendering a final decision and that she give the same consideration to Crocco's position that she has given to APM's. Secondly, to allow the plan fiduciary to avoid her obligations by turning them over to an organization that refuses all fiduciary responsibility would strip the full and fair review requirement of meaning. As the Third Circuit noted in *Grossmuller*, full and fair review must be construed not only to allow a pension plan's trustees to operate efficient claims procedures "but also to protect a plan participant from arbitrary or unprincipled decision-making." 715 F.2d at

857. Unlike APM, the court believes that a balance can be struck between efficiency and fairness.

## F. THE ADEQUACY OF NOTICE

■■■ ERISA, 29 U.S.C. § 1133(1), and its implementing regulations require that plan participants whose claims have been denied receive a notice of denial that contains the following information:

(1) The specific reason or reasons for denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f). "These requirements insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir.1992). Although the regulations apply specifically to the final notice of claim denial, courts should not allow a technical deficiency in that single communication to invalidate an otherwise reasonable decision if "claim communications as a whole are sufficient to meet the purposes of [ERISA]." *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir.1996). When a plaintiff challenges the adequacy of notice, the court must ask: "was the beneficiary supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Halpin*, 962 F.2d at 690.

In the case at bar, Crocco received two letters that together served as a final notice of the denial of her claim, subject to review by the plan fiduciary. The first, addressed to Schoenholtz from APM's Dr. Patterson on September 24, 1990, explained that the final appeals committee had determined that "[n]either the severity of the patient's symptoms, nor the intensity of service required for treatment justified continued certification at the acute level of care requested." (Pl.'s Ex. 35). The second letter, sent to Crocco on October 5, 1990 by Nazemetz, explained how Crocco could exercise her right to an ERISA review of the claim denial. (Pl.'s Ex. 37). Attached to the letter were four pages from the Xerox employee benefits handbook, which gave a more detailed explanation of Crocco's rights. The attachment informed her that any request for appeal "should be accompanied by supporting documents or records[, and] [y]ou or your beneficiary may review pertinent documents and submit issues and comments in writing." (*Id.*).

■■■ Crocco argues that these letters failed to include the reasons for denial, as required by 29 C.F.R. § 2560.503–1(f)(1), or the specific plan provision on which the denial was based, as required by 29 C.F.R. § 2560.503–1(f)(2). The defendants admit that "no one communication ... contained all of the required information," but they contend that "the communications as a whole provided Plaintiff with all the information she was entitled to under ERISA." (Defendants' Supplemental Post–Trial Memorandum, p. 2). While the court agrees with the defendants that its inquiry should encompass more than the formal denial letters, it does not agree that the communications as a whole gave Crocco adequate notice of the "*specific* reason or reasons for the denial." 29 C.F.R. § 2560.503–1(f)(1) (Emphasis added).

The defendants point to various communications that supposedly informed Crocco of the reason her claim was denied, but none of them goes beyond the conclusory statement contained in Patterson's September 24 letter to Schoenholtz. In his May 14, 1990 letter to Schoenholtz, APM's Dr. Evans explained that "any medical treatment and services required could be provided in a setting other than an inpatient acute care hospital." (Pl.'s Ex. 23). Xerox's ERISA counsel, Linda O'Brien, offered the same "explanation" verbatim in her July 23, 1990 letter to Crocco's attorney (Pl.'s Ex. 30). The court was unable to find any other indication in the record that either Xerox or APM ever provided

Crocco with a more detailed rationale for the decision to deny her claim.

On this point, the defendants' internal communications provide a useful contrast. On April 5, 1990, following his review of Crocco's case, APM's Dr. Prunier produced a three-page document detailing his reasons for denying the claim, with references to the medical record. (Def.'s Ex. A). Similarly, when Nazemetz asked APM to explain its decision, she promptly received a concise, yet detailed, explanation of why APM believed inpatient care was inappropriate. (Pl.'s Ex. 41). In *Wolfe v. J.C. Penney Co.*, 710 F.2d 388 (7th Cir.1983), the Seventh Circuit, faced with a similar situation, criticized the initial decision maker for providing the plan participant with a conclusory statement, while supplying his supervisor with a detailed memorandum: "An explanation along the lines provided in the memorandum would have apprised [plaintiff] of the reason for the denial, alerted him to the deficiency of the record accompanying his claim, and thereby aided him in building his claim with additional evidence." *Id.* at 392. In *White v. Jacobs Engineering Group Long Term Disability Benefit Plan*, 896 F.2d 344, 350 (9th Cir. 1989), the Ninth Circuit directed the same criticism at an employer who had provided the plaintiff with an unsupported conclusion, instead of the detailed reports in its possession. Like the panels in *Wolfe* and *White*, this court fails to understand why Kimberly Crocco, the bearer of clear statutory rights, was not given the same explanation provided to the APM staff and Nazemetz.

In their effort to characterize their communications as "substantial compliance" with ERISA's requirements, the defendants rely on the Sixth Circuit's decision in *Kent.* In that case, the Court found that "a large number of communications elucidated the claim beyond question," 96 F.3d at 808, but it did not describe those communications. An examination of other cases in which substantial compliance has been found reveals that the efforts of APM and Nazemetz do not fit the bill. In *Donato*, 19 F.3d at 382, the

Court found substantial compliance only because the plaintiff and her attorney had received the reports of the plan's outside medical reviewer. In *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1096 (8th Cir.1992), substantial compliance was found because the plaintiff had received two final letters containing "detailed explanations" of the decision to deny coverage. In *Brown v. Retirement Comm. of the Briggs & Stratton Retirement Plan*, 797 F.2d 521, 535–36 (7th Cir.1986), the defendant substantially complied with ERISA by providing minutes of its claim determination meeting, including detailed descriptions of the various pieces of evidence considered and the committee members' comments and reasoning. Nowhere has this court found similar evidence of substantial compliance by the defendants in the case at bar.

In *Richardson v. Central States, Southeast & Southwest Areas Pension Fund*, 645 F.2d 660, 665 (8th Cir.1981), the Eighth Circuit held that "the statute and the regulations ... require [the claims decision maker] to issue a written opinion that includes specific reasons for the decision. Bald-faced conclusions do not satisfy this requirement." This court agrees, and it finds that the defendants' failure to supply Crocco with specific reasons for their denial of her claim constituted a substantial violation of ERISA, 29 U.S.C. § 1133(1).[4]

■ .Although the critical omission here was the failure to provide a specific reason for the denial, the court also finds that the defendants failed to supply Crocco with a description of the additional material necessary to perfect her claim. 29 C.F.R. 2560.503–1(f)(3). As the Seventh Circuit wrote in *Halpin*, 962 F.2d at 691, "a blanket request for 'additional medical information' would not have satisfied the regulatory requirements.... [T]o satisfy the requirement ... the letter would have to specify the kind of additional medical information needed." *See also Wolfe*, 710 F.2d at 393 ("a

---

4. The defendants have also violated § 11.8 of the Plan, which requires that the Plan Administrator or the Claims Administrator "provide adequate notice in writing to any Participant whose claim

for benefits under the Plan has been denied, setting forth the specific reason for such denial ..." (Pl.'s Ex. 6).

fiduciary (or its agent) ought to specify with some detail what information would help resolve these questions."). In the case before this court, the defendants should have supplied Crocco with APM's specific findings regarding her mental state and her passes to leave the hospital, and they should have requested that she respond to those findings.

## III. RECONSIDERATION BY THE PLAN FIDUCIARY

In *Miller,* the Second Circuit ruled that the plan fiduciaries had made an arbitrary and capricious decision to deny benefits, but it did not order that the benefits be paid. Instead, the Court sent the case back to the plan fiduciaries for a new and legally adequate review. It took this action because it did not believe that, "upon the receipt of additional evidence, a reasonable fiduciary could only have granted the claim." 72 F.3d at 1073. Similarly, this court does not believe that granting Crocco's benefits is the only decision Nazemetz could reasonably make, and, therefore, it finds that the matter should be remanded to the plan fiduciary for further consideration.

## IV. ORDER

It is hereby ORDERED that this case be dismissed as to defendant American Psychmanagement, Inc., and remanded to the defendant, Patricia M. Nazemetz, for review of the denial of the claim for benefits submitted by the plaintiff, Kimberly Crocco, in relation to the plaintiff's hospitalization at the Rye Psychiatric Hospital Center from March 4, 1990 through June 5, 1990. This review shall be a full and fair review, as required by 29 U.S.C. § 1133(2), and it shall be conducted in light of the conclusions of the court contained in this Memorandum of Decision. The court shall retain jurisdiction over this matter until such time as the above ordered review has been conducted.

SO ORDERED.