**Thelma ELSROTH, Plaintiff,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. and Empire Blue Cross and Blue Shield, Defendants.**

No. 98 Civ. 4150(WCC).

United States District Court, S.D. New York.

July 17, 1998.

---

Bleakley Platt & Schmidt, White Plains, New York (Timothy J. Rooney, Jr., of Counsel), Carter & Coleman, Alexandria, Virginia (Douglas M. Coleman, Jacqueline E. Bennett, of Counsel), for plaintiff.

General Counsel for Empire Blue Cross and Blue Shield, New York City (Jeffrey D. Chansler, Joyce Tichy, Associate General Counsel, of counsel), for defendant Empire Blue Cross and Blue Shield.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This action is presently before the Court on Thelma Elsroth's ("Ms. Elsroth's" or "plaintiff's") motion for a preliminary injunction ordering Consolidated Edison Company of New York ("Con Ed") and Empire Blue Cross and Blue Shield ("Blue Cross") (together, "defendants") to pre-certify a high-dose chemotherapy, peripheral stem cell support treatment ("HDC–PSCT") recommended by her treating oncologist. The Court has original jurisdiction over the action pursuant to the Employee Retirement and Insurance Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and supplemental jurisdiction over plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a). For the reasons stated, the motion is denied.

### Background

Ms. Elsroth is a fifty-nine-year-old woman who suffers from ovarian cancer, which has metastasized to her liver. Her husband is an employee of defendant Con Ed, and a retired employee of New York state, and thus, she is a beneficiary of two health insurance plans, one, the "Con Ed Plan," which is insured solely by Blue Cross, and governed by ERISA, 29 U.S.C. § 1001, et seq., the other, the "Empire Plan," which is co-insured by Blue Cross and United HealthCare,[1] in connection with the New York State Health Insurance Program, N.Y.Civ.Serv. Law § 160 et seq. (McKinney 1983). See Pl.'s Ex. D.

Ms. Elsroth was diagnosed with stage IV epithelial ovarian cancer in June 1996, when a laparotomy revealed a large ovarian mass and multiple metastatic tumors or lesions in her liver. Beginning in November 1996, Ms. Elsroth was treated with paclitaxel and platinum, specifically, cisplatin and then with carboplatin.[2] However, by October 1997, Ms. Elsroth had developed new lesions. In December 1997, three of these lesions measured 6 centimeters, 4 centimeters and 5 centimeters in size. By January 1998, after further chemotherapy, the 6 and 4 centimeter lesions had shrunk to 4 and 3 centimeters, respectively, while the 5 centimeter lesion remained the same size.

Plaintiff's treating physician, Dr. Tauseef Ahmed, Chief Oncologist and Professor of Medicine at New York Medical College, Westchester County Medical Center, now recommends that Ms. Elsroth undergo se-

---

**1.** Under the Empire Plan, Blue Cross provides inpatient and outpatient hospital coverage, and United HealthCare provides basic medical. *See* Wolinsky Aff. at ¶¶ 3, 18; Pl.'s Ex. H.

**2.** Over the course of her chemotherapy, Ms. Elsroth was also treated with tamoxifen, topotecan, taxotere, doxil and navelbine.

quential or "tandem" administration of HDC in three cycles of ifosfamide, carboplatin and etoposide with peripheral stem cell rescue ("HDC–PSCR" or "HDC–PSCT").[3] Dr. Ahmed asserts that this treatment offers Ms. Elsroth the best opportunity for sustained health and life, in light of her condition. Moreover, he states that if Ms. Elsroth does not begin the treatment promptly, the cancer will probably spread to her other vital organs, and she will become physically unable to withstand the treatment. If she continues to receive standard therapy, according to Dr. Ahmed, the cancer cells will become physically resistant to the proposed treatment. Dr. Ahmed claims that he is unable to provide Ms. Elsroth with this treatment unless she is either pre-certified by defendants or makes an initial payment of $25,200 to the hospital—an amount which she states she cannot afford.

Ms. Elsroth sought pre-certification for HDC–PSCR from Blue Cross in mid-January of 1998. She provided Blue Cross with her medical records and a copy of the proposed treatment protocol. Upon reviewing these materials, Dr. Chowdhary, a Blue Cross physician, denied pre-certification on January 20, on the ground that the proposed treatment was "investigational" and "unlikely to benefit Ms. Elsroth."

Ms. Elsroth appealed this decision on January 21, pursuant to instructions provided by Blue Cross. Dr. Steven Wolinsky, Blue Cross's "medical policy" director, then reviewed her medical records, the protocol, and the medical literature provided to him by Dr. Ahmed. He concluded that the proposed treatment was investigational and therefore excludable under both health plans. However, before contacting Dr. Ahmed, and pursuant to Blue Cross policy, he arranged to have the file reviewed by an expert who was not affiliated with Blue Cross, through the Medical Care Ombudsman Program ("MCOP").[4]

MCOP referred the file to Dr. Maurie Markman, Director of the Cleveland Cancer Clinic. The file was sent directly to Dr. Markman and was accompanied by a letter from Blue Cross, instructing him to determine whether "[t]he scientific evidence supports a result of improvement in health outcomes; [t]he technology of which would improve health outcomes; . . . is as benefi-

---

3. HDC uses the same chemotherapeutic agents as standard chemotherapy but at higher doses. While often more effective at killing the cancer cells than standard chemotherapy, HDC is more likely to kill the patient's stem cells, the cells which generate white blood cells, which in turn, are the body's primary defense to infection and disease. To mitigate the potential damage to the patient's immune system, doctors extract or "harvest" some of the patients stem cells prior to administering HDC. This harvesting process, referred to as autologous stem cell rescue ("ASCR"), is accomplished in one of two ways, (1) autologous bone marrow transplant support ("ABMT"), whereby stem cells are collected from the patient's bone marrow, or (2) PSCR, whereby the stem cells are collected from the patient's blood stream. Under both procedures, the harvested cells are frozen and stored until the HDC is complete, at which time they are reintroduced to the patient's body. See Smith v. CHAMPUS, 97 F.3d 950, 951 (7th Cir.1996), cert. dismissed, —— U.S. ——, 117 S.Ct. 1027, 137 L.Ed.2d 212 (1997); Bailey v. Blue Cross & Blue Shield of Va., 67 F.3d 53, 55 (4th Cir.1995).

4. MCOP is a private organization run by an attorney in Washington D.C. Wolinsky Aff. at ¶ 12; Picerno Aff. at ¶ 1. It provides referrals for insurers, such as Blue Cross, that seek review of patients to whom they have denied pre-certifica-tion, on the grounds that the proposed treatment is "experimental/investigational." See id. at ¶ 12; see also Grethe v. Trustmark Ins. Co., 881 F.Supp. 1160, 1163 (N.D.Ill.1995); Fenio v. Mutual Omaha Ins. Co., 868 F.Supp. 318, 319 (S.D.Fla.1994); Snell v. Travelers Ins. Co., No. 93 Civ. 0001, 1993 WL 274240, at *4 (E.D.Pa. June 30, 1993). At the request of an insurer, MCOP selects a reviewer and then the insurer forwards the patient's file, as well as a description of the proposed treatment. Wolinsky Aff. at ¶ 12. The reviewers are selected randomly from a certified panel in rotation, according to the reviewer's specialty and availability. Id. Once selected, the reviewer reviews the patient's records and provides an opinion as to whether the proposed treatment is appropriate in light of current medical practice, "within the framework of the [plan's] provisions." Id. The insurers purportedly have "no control or influence" over the reviewers. Id. MCOP has access to over 140 oncologists nationwide. See id. Blue Cross has been using MCOP's services since 1995. Picerno Aff. at ¶ 2. In 1996, Blue Cross referred 47 cases to MCOP. Of the 47, Blue Cross denied coverage in 30 and approved coverage in 17. Id. In 1997, Blue Cross referred 69 cases, denied coverage in 33 and approved coverage in 26. Id. As of June 16, 1998, Blue Cross has referred 20 cases in 1998, of which 9 have been denied coverage and 11 approved. Id.

cial as any established alternatives; ... is attainable outside the investigational setting; ... and is a well-designed study for which [Ms. Elsroth] is a good candidate." Accordingly, Dr. Markman reviewed Ms. Elsroth's file, as submitted by Blue Cross, on January 21–23. He determined that the proposed treatment was "highly experimental" and "of absolutely no known clinical benefit in [Ms. Elsroth's] setting." Defs.' Ex. C. He reasoned that Ms. Elsroth "has extensive and highly chemo resistant ovarian cancer .... [with] minimal shrinkage," and that any response to the therapy would be "of short duration," and concluded that "there [was] no evidence [that chances of] survival or quality of life [would be] improved compared to far less intensive and far less morbid treatment approaches," and thus, that the proposed treatment was not "a reasonable therapeutic option" for Ms. Elsroth. *Id.* On the basis of Dr. Markman's opinion, Blue Cross denied plaintiff's appeal.

On March 4, Ms. Elsroth again appealed Blue Cross's decision. She submitted a new CT scan to Blue Cross which showed that the lesions had shrunk to 3, 2.5 and 2 centimeters in size. Blue Cross once again contacted MCOP to request expedited review by a second, independent reviewer. Accordingly, Ms. Elsroth's file was reviewed by Dr. David Vesole, Associate Professor of Medicine and Clinical Director, Bone Marrow Transplant, at the Medical College of Wisconsin. Dr. Vesole concluded that the proposed treatment was investigational, as defined by the plan, and that Ms. Elsroth would "not benefit from [it]." *See* Defs.' Ex. E. He reasoned that

Ms. Elsroth has persistent bulky disease .... (at least 3 lesions greater [than] 1

cm).... Based upon the [relevant] studies, she does not fit the profile of patients who would ... benefit from the proposed treatment—she is over 48, has received multiple prior therapies, has not achieved an excellent remission, [and] has small lesions which have not changed[ ].

*Id.* After having received Dr. Vesole's review, Blue Cross again declined to pre-certify the treatment.

Ms. Elsroth requested further review on or about April 14 and May 5, 1998, when a new CT scan allegedly revealed that her liver lesions had further responded to chemotherapy. Dr. Markman reviewed the CT scan and again concluded that the treatmemt was "experimental." Defs.' Ex. F. Dr. Wolinsky conferred with Dr. Manion of United Health-Care, the co-insurer of the Empire Plan. Dr. Manion stated that in his opinion, coverage should be denied, because of "the large size of Ms. Elsroth's tumor[s]." Wolinsky Aff. at ¶ 18. Blue Cross again denied pre-certification on or around May 6, 1998.

Thereafter, having exhausted her administrative appeals, Ms. Elsroth filed this action, together with the instant motion for a preliminary injunction ordering defendants to grant pre-certification for the proposed HDC–PSCR treatment, and to clarify her rights to future benefits under the Con Ed and Empire Plans.[5] After fully briefing the issues, the parties appeared before the Court at a scheduled evidentiary hearing on June 23–24. At that time the Court heard testimony from Dr. Ahmed, and viewed Dr. Markman's videotaped deposition.[6] At the close of the proceedings, in view of the conflict in their testimony, the Court, with the concurrence of the parties, decided to appoint an independent expert, pursuant to Fed.R.Evid. 706, to advise the Court as to

---

5. In order to obtain judicial review a denial of benefits under ERISA, a claimant must show that she has either exhausted her administrative remedies, *see Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993); *Alfarone v. Bernie Wolff Constr. Corp.*, 788 F.2d 76, 79 (2d Cir.1986), or that exhaustion would be futile, *see State of New York v. Sullivan*, 906 F.2d 910, 917–18 (2d Cir.1990). Because Ms. Elsroth has appealed Blue Cross's decision to deny pre-certification three times, and her file has been reviewed by at least five different physicians, we

conclude that further review would be futile, to the extent that it would be limited to the administrative record.

6. Dr. Ahmed put forth additional evidence at the hearing of what he considered to be further response to the chemotherapy: a CT scan of June 20, 1988 which revealed further shrinkage in Ms. Elsroth's lesions to 2 and 2.3 cm and blood test results that revealed a decrease to 13 in her level of CA 125 protein, an ovarian cancer marker.

the value of the proposed treatment in this case. After receiving suggestions from the parties and others knowledgeable in the field, we selected Dr. David Spriggs, Chief of Developmental Chemotherapy Service, Memorial Sloan–Kettering Cancer Center. The Court received Dr. Spriggs's written opinion on July 6.

## Discussion

Plaintiff argues that defendants should be ordered to cover the proposed treatment on the ground that their denial of coverage was arbitrary and capricious. Her argument is two-part. First, she claims that defendants' reasons for the denial of coverage were beyond the terms of the contract and ambiguous, and that the contractual terms themselves are ambiguous. Second, she asserts that the proposed treatment is safe and effective, and generally accepted by the medical community, and is the best therapy for her. We will examine each of her arguments in turn, under both ERISA and New York law, after articulating the proper standards of review.

However, before reaching a detailed analysis of the issues, we summarize our conclusions. First, we conclude that plaintiff has not shown that the relevant plan terms were ambiguous under federal common law or state law, or that the language contained in the denial letters was misleading or insufficient under ERISA.

Second, we conclude that it is unlikely that plaintiff will be successful on her claim that Blue Cross wrongfully withheld pre-certification. Guiding that conclusion is the fact that all of the medical experts who have reviewed the case (excepting, of course, plaintiff's own treating oncologist) have emphatically opined that the proposed treatment is not likely to be of any benefit to Ms. Elsroth and is much more likely to cause her harm than the standard chemotherapy she has been receiving. Although the Court denies Ms. Elsroth the relief she seeks primarily for this reason, in the interest of completeness, we will consider each of the arguments made on her behalf.

### Preliminary Injunction Standard

"It is by this time black-letter law that the party seeking a preliminary injunction must establish that: (1) absent injunctive relief, [she] will suffer an irreparable injury; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.,* 143 F.3d 688, 694 (2d Cir. 1998); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979). For the following reasons, we conclude that Ms. Elsroth has failed to show either irreparable injury or the likelihood of success on the merits. We therefore decline to order the preliminary injunction.

## I. *Irreparable Harm*

The evidence does not show that Ms. Elsroth will suffer irreparable harm if defendants are not immediately compelled to provide the benefits she has requested. We note at the outset that plaintiff's method of demonstrating irreparable harm rests solely on Dr. Ahmed's opinion that HDC–PSCT represents not only Ms. Elsroth's "best" therapeutic option, but her only chance of survivial. If that were true, irreparable harm would obviously have been shown, but the record clearly establishes that it is not. In fact, Dr. Ahmed himself admits that, if Ms. Elsroth is not given the HDC–PSCT, she should continue receiving standard chemotherapy, although he cautions that if she continues to receive the drugs at standard doses, she will ultimately become resistant to them, and less likely to benefit from the HDC–PSCT. While this may be true, as discussed more fully below, the overwhelming evidence is that she will benefit no more from the proposed treatment than from a continuation of the standard chemotherapy.

Three *highly acclaimed oncologists,* including the independent expert appointed by the Court, have determined that Ms. Elsroth will not benefit from the HDC, and may in fact be harmed or even killed by it. According to Dr. Markman, whose practice is "restricted to women with gynecologic pelvic malignancies, .. the majority of [whom have] ovarian cancer," the proposed treatment "has no hope for benefit but a potential for causing

major harm, even death," Markman Dep. at 37, because Ms. Elsroth "has extensive and highly chemo resistant ovarian cancer .... [with] minimal shrinkage."[7] Defs.' Ex. C. "[T]o put it mildly," says Markman, it is "an incredibly morbid strategy" that is "inappropriate and wrong." Markman Dep. at 50. "[T]here [is] no evidence [in the medical literature or her medical history that her] survival or quality of life [would be] improved [with HDC] compared to far less intensive and far less morbid treatment approaches." Defs.' Ex. C.[8] According to Dr. Vesole, "Ms. Elsroth ... does not fit the profile of patients who would ... benefit from the proposed treatment—she is over 48, has received multiple prior therapies, has not achieved an excellent remission, [and] has small lesions which have not changed[ ]." Defs.' Ex. E. According to Dr. Spriggs, the court's own expert, "the likelihood of benefit [with HDC] is no greater than [with] standard therapy and [the] risk of treatment related morbidity and mortality is greater." Spriggs Op. at 5. Furthermore, according to Spriggs, "more aggressive therapy may shorten [Ms. Elsroth's] life." *Id.* In response to the specific question whether the proposed HDC treatment would benefit Ms. Elsroth, he answered, "[e]mphatically not." *Id.* In the face of these strong opinions, the Court cannot find that its failure to compel defendants to pay for the treatment in question will result in irreparable harm to Ms. Elsroth. Thus she has not satisfied the first requirement for a preliminary injunction and her motion must be denied. *Accord Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 296 (7th Cir.1997) (denying preliminary injunction where plaintiff could not show that "prescribed treatment will be more effective than the traditional chemotherapy she is undergoing").

Moreover, it is undisputed that the HDC treatment would cause Ms. Elsroth to suffer even more intensely from the same symptoms as from standard chemotherapy, including nausea, vomiting, fatigue, diarrhea, stomach pains, and numbness. *See* Spriggs Op. at 4 ("[T]here are toxicities and complications of high dose therapy which are not seen at standard doses. These toxicities are well described by Dr. Ahmed."). *See also* Markman Dep. at 50.[9] Because the goal of the treatment, according to Dr. Ahmed, is to "enhance the quality of Ms. Elsroth's life,"[10] the Court cannot conclude, for this additional reason, that she will suffer irreparable harm if the treatment is withheld. *Cf. Watts v. Massachusetts Mutual Life Ins. Co.*, 892 F.Supp. 737, 743 (W.D.N.C.1995) (no irreparable harm where proposed treatment would cause plaintiff to suffer from anemia and pneumonia and would expose plaintiff to risk of death).

## II. *Likelihood of Success on the Merits*

In addition to the failure to show irreparable harm, there is another reason to deny Ms. Elsroth the relief she requests. As previously stated, she has failed to show a substantial likelihood that she will be successful on the merits of her claim that Blue Cross wrongfully denied her pre-certification.

To start, we note that the parties vigorously debate which review standard applies to Blue Cross's decision to deny benefits under the Con Ed Plan. Although we conclude that under all possible standards, the decision to deny benefits should be upheld, we neverthe-

---

7. Throughout the proceedings, the witnesses sharply disagreed as to whether or not Ms. Elsroth's tumors were "chemo sensitive." Dr. Ahmed concluded that they were, because upon receiving chemotherapy, her lesions decreased in size. *See* Pl.'s Ex. J. Dr. Markman opined otherwise because, while Ms. Elsroth had a partial response to chemotherapy, that response was brief, and "the disease came back very quickly." Markman Dep. at 95. Dr. Markman concluded that she is not "highly chemotherapy sensitive," because "the amount of [her] disease ... is massive and [she] absolutely cannot be cured." Markman Dep. at 28.

8. In fact, Dr. Markman opines that "it makes ... sense to continue the same or similar strategies." Markman Dep. at 36.

9. Dr. Ahmed admitted that the side effects of HDC are more severe than those of standard chemotherapy at the evidentiary hearing. We cannot quote his testimony verbatim, because a transcript of the hearing has not been provided.

10. Dr. Markman agrees: "[t]he goal is to ... optimize the quality of life." Markman Dep. at 81.

less will briefly consider the parties' arguments in connection with these standards.

### A. Standard of Review under ERISA

As previously stated, the Con Ed plan is governed by ERISA. Accordingly, plaintiff brings her motion pursuant to 29 U.S.C. § 1132(a)(1)(B).[11] The rules governing the standard of review under 29 U.S.C. § 1132(a)(1)(B) were articulated by the Supreme Court in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *Firestone* held that "a denial of benefits is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case it is reviewed under an arbitrary and capricious standard. *Id.*

Under a de novo standard, a court reviews the administrative record and the plan at issue to determine for itself whether the claimant should be granted or denied the requested relief. *See DeFelice v. American Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 65 (2d Cir.1997). Where, however, the standard of review is arbitrary and capricious, the court may not substitute its judgment for the administrator, "as if considering the issue of eligibility anew." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995). Rather, it must solely " 'consider whether the [administrator's] decision was based on … the relevant factors and whether there has been a clear error of judgment,' " *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971),[12] and may overturn a decision only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan*, 52 F.3d at 441–42; *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir.1995) (allowing reversal where fiduciary "impose[d] a

standard not required by the plan's provisions or interpret[ed] the plan in a manner inconsistent with its plain words") (citation omitted).

Firestone suggests an intermediate standard of review: "if the administrator or fiduciary … is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there [has been] an abuse of discretion.' " *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). The Court of Appeals has further explained that when a conflict of interest is claimed, a court must inquire as to the following: "first, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; and second, whether the evidence shows that the administrator was in fact influenced by such conflict." *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255 (2d Cir.1996). "If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the standard de novo." *Id.* at 1256; *see also Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 476–77 (2d Cir.1997) (applying *Sullivan* where administrator denied reimbursement for cost of HDC–ABMT to advanced breast cancer patient). *Cf. DeFelice*, 112 F.3d at 66 (court gives "even a conflicted insurer the same deference as an independent fiduciary").

■ While the parties contest whether an arbitrary and capricious or de novo standard applies, they agree that the plan vests "sole discretion" in the administrator to determine eligibility, *see* discussion *infra* Part I.B.2, and that Blue Cross is inherently conflicted whenever it makes this determination.

---

**11.** Section 1132(a)(1)(B) provides that a civil action may be brought by a beneficiary "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] right under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."

**12.** In reviewing a denial of coverage under *Firestone*, we are necessarily constrained to the ad-

ministrative record. This does not mean that we are limited to the evidence explicitly relied upon by the administrator; we may consider all of the facts readily available to it at the time it denied coverage. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir.1995); *Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 105 (2d Cir.1991).

Plaintiff suggests that Blue Cross was perhaps more conflicted in this case, because the requested benefits greatly exceed the premiums paid by the Elsroths. But this is not the *Sullivan* test. Under *Sullivan*, a claimant must show that such conflict in fact influenced the administrator's decision. If this were not the standard, a court would necessarily find a conflict of interest every time the cost of the benefits exceeds the total premiums paid, an unfortunate reality for virtually every cancer patient. *Accord English v. Metropolitan Life Ins. Co.*, No. 94 Civ. 3155, 1996 WL 281530, at *4 (E.D.N.Y. May 22, 1996) ("[c]onflicts of interest are inherent in every case where the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims;" thus, "size of rejected claim is but one factor for consideration") (citing *Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *Pagan*, 52 F.3d at 442). Accordingly, we conclude that Ms. Elsroth has not shown that Blue Cross was in fact influenced by its conflict of interest. Notably, before ultimately denying pre-certification to Ms. Elsroth, Blue Cross referred her file to MCOP, a third-party, that arranged for review by two independent physicians. While Ms. Elsroth claims that MCOP has an institutional bias against oncologists who perform HDC, the court notes that in some 100 cases that were initially denied coverage by Blue Cross under the experimental/investigational exception, on the recommendations of MCOP consultants, Blue Cross ultimately granted coverage on almost 50 of those claims. Moreover, one of Ms. Elsroth's reviewers was a bone marrow specialist who heads the transplant unit at a university hospital in the midwest, and who would be expected to favor the proposed treatment. In light of these facts, we decline to find an institutional bias against the proposed treatment.

Additionally, we conclude that application of the *Sullivan* standard to this case would have little, if any, effect on our decision. For the reasons discussed below, even upon a de novo review, we would deny the preliminary injunction on the basis that the proposed treatment is experimental and investigational, as defined by the plan, and of no value to Ms. Elsroth, considering her condition and age and the attendant risks of the treatment.

### B. *Review of the Denial of Benefits*

Our review necessarily begins with the plan language at issue. The Con Ed Plan provides, in relevant part, that "unless otherwise required by law," Blue Cross

will not cover any treatment [or] procedure (herinafter "technology") ... or any hospitalization in connection with such technology if, *in [its] sole discretion, it is not medically necessary in that such technology is experimental or investigational* . Experimental or investigational means that the technology is:

1. not of proven benefit for the particular diagnosis or treatment of the Covered Person's particular condition; or

2. not generally recognized by the medical community as reflected in the published peer reviewed medical literature as effective or appropriate for the particular diagnosis or treatment of the Covered Person's particular condition.

The plan further states that Blue Cross

may apply the following five criteria in exercising (its) discretion and *may in [its] discretion require that any or all of the criterial be met:*

[1] any ... drug ... must have received final approval to market by the United States Food and Drug Administration for the particular diagnosis or condition ... ;

[2] *conclusive evidence from the published peer reviewed medical literature must exist that the technology has a definite positive effect on health outcomes;* such evidence must include well-designed investigations that have been reproduced by nonaffiliated authoritative sources, with measurable results, backed up by the positive endorsements of national medical bodies or panels regarding scientific efficacy and rationale;

[3] demonstrated evidence as reflected in the published peer reviewed medical literature must exist that *over time the technology leads to improvement in health outcomes, i.e., the beneficial effects outweigh any harmful effects;*

[4] proof as reflected in the published peer reviewed medical literature must exist that the technology *is at least as effective in improving health outcomes as established technology, or is usable in appropriate clinical contexts in which established technology is not employable;*

[5] proof as reflected in the published peer reviewed medical literature must exist that improvement in health outcomes, as defined in paragraph 3, is possible in standard conditions of medical practice, outside clinical investigatory settings.

Pl.'s Ex. D (emphasis added). The Empire Plan contains virtually the same language, and the parties agree that for the purposes of this motion, the two plans are identical.

In opposing the present motion, Blue Cross claims that it relied on the above exclusion to deny pre-certification to Ms. Elsroth under both plans for the chemotherapy and transplantation to which she claims she would otherwise be entitled. Plaintiff's response is two-part. First, she argues that Blue Cross should be compelled to cover the proposed treatment, because in denying pre-certification, it did not rely on the exclusionary language in the plan, but concocted its own terms. Second, she argues that even if Blue Cross in fact relied on the plan language to deny benefits to Ms. Elsroth, the treatment should nonetheless be pre-certified because each time Blue Cross denied pre-certification, it did so on different grounds, and alternatively, because the exclusionary language is ambiguous. We address each of these arguments in turn.

### 1. *Did the denial letters violate ERISA?*

█ .Plaintiff argues that Blue Cross did not rely on the terms of the Con Ed plan when it denied pre-certification to her. She

claims that instead, Blue Cross impermissibly used its "own terms" in the denial letters, and that in any case, the reasons articulated therein varied from letter to letter and were so vague that she could not understand them. With respect to these arguments, we must note that in the course of handling the pre-certification request, Blue Cross was compelled to write to both Ms. Elsroth and Dr. Ahmed a minimum of four times, because Ms. Elsroth instituted at least three appeals after the initial denial of pre-certification. Thus, in reviewing Blue Cross's stated reasons for denying coverage, we must bear in mind that each response was the result of separate review by an individual physician, though, of course, the plan administrator remained the same throughout the process. The several letters sent by Blue Cross read respectively as follows:

(1) Pre-certification denied on the grounds that Ms. Elsroth had not shown "adequate clinical response as defined by medical policy" to qualify "for single HDC/PSCT," and "[t]he use of more than one course of high dose chemotherapy with rescue is regarded as investigational" by Blue Cross.

(2) Appeal denied because Ms. Elsroth "ha[s] no significant chemosensitivity or response to chemotherapy and is unlikely to benefit from high dose chemotherapy."

(3) Second appeal denied because an "independent review" has established "that the use of high dose chemotherapy will not benefit" Ms. Elsroth, and that Ms. Elsroth "has chemo resistant bulky residual disease. Therefore, the purposed [sic] treatment would be considered experimental/investigational."

(4) Final appeal denied on the ground that "the proposed treatment is experimental, not medically necessary and of no proven benefit."

Pl.'s Exs. E–I.

█ In considering plaintiff's first argument, we are mindful that an insurer who denies benefits under a plan governed by ERISA must rely on the express language of the plan itself. It may not insert its own

terms into the plan. *Velez v. Prudential Health Care Plan of N .Y., Inc.,* 943 F.Supp. 332, 341 (S.D.N.Y.1996) ("a fiduciary ... cannot disregard any policy requirement, nor can it implicitly incorporate into the policy any term that does not expressly appear"); *Kekis v. Blue Cross and Blue Shield of Utica–Watertown, Inc.,* 815 F.Supp. 571, 579 (N.D.N.Y.1993) ("fiduciary who ignores the terms of the policy and inserts its own terms acts arbitrarily and capriciously"); *Dozsa v. Crum & Forster Ins. Co.,* 716 F.Supp. 131, 139 (D.N.J.1989) (fiduciary abused discretion where he "applied a different exclusion having different criteria from the Plan's exclusion"). Moreover, "[o]nce the insured shows that a loss has occurred, the insurer shoulders the burden of demonstrating that the loss claimed is excluded expressly from the policy terms." *M.H. Lipiner & Son, Inc. v. Hanover Ins. Co.,* 869 F.2d 685, 687 (2d Cir.1989).

Here, plaintiff argues that in denying her the benefits she requested, Blue Cross abused its discretion because it relied on terms such as "adequate clinical response," "medical policy," and "significant response to chemotherapy" which are not contained in the plan. The Court is not persuaded by plaintiff's attempt to interpret the plan's coverage terms so broadly and to define Blue Cross's discretion so narrowly. When read together with the rest of the plan, particularly with the provisions defining that discretion, is clear that Blue Cross, in its application of the "experimental/investigational" exclusion, reserved the right to "develop and adopt standards which describe in more detail when [it] will or will not make payments under [the] Contract ... and administrative rules pertaining to Group eligibility ... and other administrative matters .... and to make and establish (and thereafter change) rules and regulations and procedures with respect to th[e] Contract." Pl.'s Ex. D.

Nor can we say that the terms "adequate clinical response," "medical policy," and "significant response to chemotherapy," as stated in the denial letters, are ambiguous or vague in the context of Ms. Elsroth's application. Like the policy terms themselves, these rea-sons cannot be considered in isolation, without reference to accompanying discussions that shed light on their meaning. For example, the proposed treatment was against "medical policy," because "it proposed the use of more than one course of high dose chemotherapy with rescue," a treatment which Blue Cross regarded as "investigational." Ms. Elsroth's response to chemotherapy was "[in]adequate" and "[in]significant," because it failed to meet the criteria suggested by Dr. Ahmed in the pre-certification application itself, *i.e.,* that her response was evidenced by a decrease in the size of the liver lesions. Additionally, plaintiff's argument belies the fact that the stated reason for denying treatment in the first and final instance was the "experimental/investigational" exception, which is stated in the plan. *Cf. Crocco v. Xerox Corp.,* 956 F.Supp. 129, 142 (D.Conn.1997), *aff'd as modified,* 137 F.3d 105 (2d Cir.1998) (ERISA regulations "apply specifically to the final notice of claim denial").

■ In addition to taking issue with the manner in which the individual denial letters were worded, plaintiff claims that she is entitled to relief, because each time she was denied pre-certification, the reason for the denial was articulated on different grounds. We disagree with plaintiff for two reasons. First, ERISA does not require an administrator to articulate its denial in precisely the same way, each time it sends correspondence to a claimant. To hold a fiduciary to such a rigid mechanical standard would in itself violate ERISA, which merely requires "substantial compliance" with its terms. *See, e.g., Crocco,* 956 F.Supp. at 142 ("courts should not allow a technical defect .... to invalidate an otherwise reasonable decision"); *see also Borowski v. IBM, Corp.,* 978 F.Supp. 550, 557 (D.Vt.1997) (reason for denial need only "provide claimant and the courts with a sufficiently precise understanding of the grounds of denial to permit a realistic possibility of review").

Second, as previously stated, we think that the denial letters were based on the "experimental/investigational" exception, and not on any other term which does not appear in the plan. The letters were worded differently

merely to comport with each appeal and the medical opinion on which the denial was based. For example, when Dr. Markman recommended against the treatment because Ms. Elsroth was not sufficiently "chemosensitive," as shown by the CT scans that plaintiff had submitted, that explanation was stated in the denial letter. The same holds true with respect to the description of the cancer as "bulky" and "chemo resistant," terms suggested by Dr. Vesole. Here, plaintiff is basically asking the court to penalize Blue Cross for giving her the opportunity to make multiple appeals. This we will not do.[13]

### 2. *Is the plan language ambiguous?*

■ In addition to contesting the manner in which the pre-certification denials were conveyed to her, plaintiff argues that the exclusionary terms relied upon by defendants are ambiguous, and therefore must be interpreted against them. ERISA plan contracts are construed according to federal common law. *Masella,* 936 F.2d at 107; *Katz v. Colonial Life Ins. Co. of America,* 951 F.Supp. 36, 40 (S.D.N.Y.1997); *see also Firestone,* 489 U.S. at 110, 109 S.Ct. 948 ("courts are to develop a common law of rights and obligations under ERISA-regulated plans"). The federal common law governing ERISA "embodies common-sense canons of contract interpretation." *Brooke v. Home Life Ins. Co.,* 864 F.Supp. 296, 299 (D.Conn.1994). Thus, "straightforward language in an ERISA policy must be given its natural meaning." *Fischman v. Blue Cross & Blue Shield of Conn., Inc.,* 775 F.Supp. 513, 515 (D.Conn.1991) (Cabranes, J.) (citation omitted). A court must consider contractual language within the context of the entire agreement, rather than focus on a particular term. *See U.S. Fire Ins. Co. v. General Reins. Corp.,* 949 F.2d 569, 571–72 (2d Cir.1991); *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). Therefore, a court may not create an ambiguity by "[s]training a contract's language beyond its reasonable and ordinary meaning." *Swensen v. Colonial Life Ins. Co. of Am.,* No. 91 Civ. 5793, 1993 WL 378470, at *2 (S.D.N.Y. Sept.22, 1993). "Nor may an ambiguity be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning." *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 149 (2d Cir.1993). Only where an ERISA-plan term is truly ambiguous is it to be construed against the insurer. *See I.V. Servs. of Am., Inc. v. Trustees of the Am. Consulting Engineers Council Ins. Trust Fund,* 136 F.3d 114, 121 (2d Cir.1998); *Masella,* 936 F.2d at 107. Contract language is only ambiguous "if, when considered objectively from the viewpoint of a 'reasonably intelligent person' it is subject to more than one meaning." *Katz,* 951 F.Supp. at 40 (quoting *Sayers v. Rochester Tel. Corp. Suppl. Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993)). New York law is virtually the same. *See, e.g., Uribe v. Merchants Bank of N.Y.,* 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 396, 693 N.E.2d 740 (1998) (although "ambiguities ... are ... to be

---

**13.** Even if plaintiff were correct that the these technical differences somehow violated ERISA, we would not grant her the requested relief without further analysis of her claims because the appropriate remedy is not, as plaintiff suggests, an award of benefits, but an opportunity for "full and fair review" of the claim in federal court. *See, e.g., George v. First Unum Life Ins. Co.,* No. 93 Civ. 2916, 1995 WL 231254, at *2 (S.D.N.Y. April 18, 1995); *Dawes v. First UNUM Life Ins.,* 91 Civ. 0103, 1992 WL 350778, at *4 (S.D.N.Y. Nov.13, 1992). Moreover, to the extent that plaintiff claims she is entitled to the injunction because Blue Cross did not timely respond to her request for plan documents, she is mistaken. The remedy for such delay is generally the imposition of a penalty against the administrator, where the plan administrator fails to respond to the request within 30 days. Such relief is not appropriate here, since Blue Cross responded within seventeen days of the request. *Cf.* 29 U.S.C. § 1133(c) (court may award up to $100 per day when administrator fails to provide requested information within 30 days of request or "such other relief as it deems proper"); *Kascewicz v. Citibank,* 837 F.Supp. 1312, 1322–23 (S.D.N.Y.1993) (mere fact of delay does not mandate penalty after 30 days, absent showing of bad faith or prejudice arising from delay); *see also Lacoparra v. Pergament Home Ctrs., Inc.,* 982 F.Supp. 213, 230 (S.D.N.Y.1997) (same). *Cf. Pagovich v. Moskowitz,* 865 F.Supp. 130, 137 (S.D.N.Y.1994) (imposing penalty where administrator waited 7 months to reply to request); *Porcellini v. Strassheim Printing Co.,* 578 F.Supp. 605, 614–15 & n. 2 (E.D.Pa.1983) (same, while limiting penalty to $25 per day, where administrator acted with "complete indifference" to multiple requests).

construed against the [drafter], particularly when found in an exclusionary clause ... it is well established that when the meaning of [a] ... contract is plain and clear ... (it is) to [be] enforced according to its terms ... and not to be subverted by straining to find an ambiguity") (citation omitted); *see also Caporino v. Travelers Ins. Co.,* 62 N.Y.2d 234, 239, 476 N.Y.S.2d 519, 521, 465 N.E.2d 26 (1984) (per curium) (court "may not disregard clear provisions which the insurer inserted in the policies and the insured accepted, ... equitable considerations will not allow an extension of coverage beyond its fair intent and meaning") (citation omitted); *Rhinebeck Bicycle Shop, Inc. v. Sterling Ins. Co.,* 151 A.D.2d 122, 126, 546 N.Y.S.2d 499, 502 (3d Dept.1989) (when "provisions which clearly and specifically (make) certain [exclusions], such provisions take precedence over other clauses which may describe or acknowledge general areas of coverage such that no ambiguity exists").

■ Here, plaintiff raises two arguments. First, she asserts that particular plan terms were ambiguous, and difficult to understand, because they were not defined in either plan. Specifically, plaintiff claims that the terms "conclusive" and "definite positive effect," under the experimental/investigational exclusions are ambiguous. We disagree. The language is neither ambiguous nor uncertain, when it is considered in light of the language that immediately follows it. A "conclusive" or "definite positive effect," is one that is supported with "well-designed investigations [that] ... have been reproduced by nonaffiliated authoritative sources, with measurable results, backed up by the positive endorsements of national medical bodies or panels regarding scientific efficacy and rationale," which have been reported in "the peer reviewed medical literature;" "that over time ... lead[ ] to improvement in health outcomes, i.e., the beneficial effects outweigh any harmful effects;" and that the "technology [used to obtain the results is] at least as effective in improving health outcomes as established technology, or is usable in appropriate clinical contexts in which established technology is not employable." Other courts that have construed similar language have likewise concluded that it is not ambiguous as

a matter of law. *See, e.g., Esdale v. American Comm'y Mutual Ins. Co.,* 914 F.Supp. 270, 271 (N.D.Ill.1996) (phrase, "appropriate technological assessment" not ambiguous when it precedes "by any state or federal government"); *Estate of Goldstein v. Fortis Benefits Co.,* 93 Civ. 2004, 1996 WL 18977, at *4 (N.D.Ill. Jan. 19, 1996) (requirement that treatment be "effective for treating the condition," not ambiguous); *Sven v. Principal Mutual Life Ins. Co.,* No. 95 Civ. 5332, 1996 WL 539109, at *4 (N.D.Ill. Sept. 20, 1996) (same, with respect to "accepted medical standards") *see also Bechtold v. Physicians Health Plan of Northern Indiana, Inc.,* 19 F.3d 322, 326 (7th Cir.1994) (phrase, "right to change ... list of experimental treatments" did "not obligate [fiduciary] to reclassify hourly, weekly, monthly or annually whether a treatment should be covered on the basis of competing views of medical experts"). *Cf. Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1382–83 (11th Cir.1993) (finding ambiguity where plan did not define "experimental"); *Johnson v. District 2 Marine Engineers Beneficial Ass'n,* 857 F.2d 514, 516 (9th Cir.1988) (same, with respect to "experimental surgery"); *Pirozzi v. Blue Cross–Blue Shield of Va.,* 741 F.Supp. 586, 589 (E.D.Va.1990) (same, where "experimental" and "clinical investigative" were not defined).

■ Additionally, plaintiff argues that because the plans cover FDA-approved drugs "for general use in treating the ... sickness for which they are prescribed" and certain bone marrow transplants, the average people who read the plans would not understand that they were not automatically entitled to these benefits, if they were sick, and their physicians prescribed them. This argument is unpersuasive, when considered in light of the rest of the plan, and in particular, the riders at issue, which contain the experimental/investigational exclusions.

As previously shown, these exclusions explicitly state that the plans do not cover drugs, treatments or procedures which, in the view of Blue Cross alone, are not "medically necessary," "of proven benefit for the particular diagnosis or treatment of the Cov-

ered Person's particular condition," or "generally recognized by the medical community as ... effective or appropriate for ... the Covered Person's particular condition." Given these exclusions, the Court fails to see how any reasonable person could conclude that all of the individually listed benefits will be provided to them, merely upon their doctor's recommendation. Such an interpretation is grossly inconsistent with each of the contracts, when they are considered as a whole. *Cf. Hendricks v. Central Reserve Life Ins. Co.*, 39 F.3d 507, 510 (4th Cir.1994) (rejecting argument that bone marrow stem cell transplant was included under plan's transplantation benefits where HDC–PSCR was deemed "experimental and investigational" by insurer and therefore excluded under the exception); *see also Grethe*, 881 F.Supp. at 1168 (no ambiguity with regard to cancer drug benefits where exclusion stated that "[b]enefits will be paid only for 'Medically Necessary' care"). Because plaintiff's interpretation is wholly unreasonable, there can be no ambiguity in either plan. Accordingly, the Court cannot issue the requested preliminary injunction on the ground that the "experimental/investigational" exclusions are ambiguous.

3. *Did Blue Cross wrongfully deny precertification based on its opinion that the proposed treatment was experimental or investigational?*

■ For the reasons stated above, in our discussion of irreparable harm, we must conclude that the answer is no, whether we were to review the record de novo or under an abuse of discretion standard. Based solely on the administrative record, we conclude that plaintiff is unlikely to show at trial that the proposed treatment was not experimental, as defined by the plans, because the evidence overwhelmingly suggests that it would not be "appropriate," "effective" or beneficial to her. In sum, "[t]here is simply no evidence in the record that HDC–PSCT has yet become generally accepted or standard in practice for treatment of [stage IV] epithelial ovarian cancer," *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1207 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 629, 139 L.Ed.2d 609

(1997), or that such treatment would be appropriate for Ms. Elsroth. While HDC may be beneficial for other cancers, it is experimental with respect to the treatment of the type of cancer suffered by Ms. Elsroth, particularly where the cancer has progressed to such an advanced stage. *Accord Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1259 (3d Cir.1993) (the term "experimental procedure must be defined in terms of its particular application, i.e., whether it is an experimental procedure for the basis for upsetting Blue Cross's decision to decline pre-certification."

### Conclusion

We are acutely sympathetic with the plight of Ms. Elsroth and with her urgent efforts to exhaust every chance of obtaining medical help, however remote. Thus if the evidence before the Court showed any significant likelihood that the proposed course of high-dose chemotherapy would benefit her, we might strain to find on this basis that the treatment was not "experimental or investigational" in her case and that it accordingly should be covered under the policies. But the unanimous and emphatic opinion of all of the independent experts who have reviewed her case that the treatment will *not* benefit her compels the Court to conclude, reluctantly but confidently, that her motion for a preliminary injunction compelling pre-certification of the treatment must be denied.

SO ORDERED.